# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN JOSE DIVISION

|  |  |
|---|---|
| DERRICK SANDERLIN, et al.,<br><br>　　　　　　Plaintiffs,<br><br>　　v.<br><br>CITY OF SAN JOSE, et al.,<br><br>　　　　　　Defendants. | Case No.  20-cv-04824-BLF<br><br>**ORDER GRANTING IN PART AND DENYING IN PART MOTION TO DISMISS**<br><br>[Re:  ECF No. 73] |

This case involves serious allegations of police misconduct in response to protests over the killing of George Floyd that took place between May 29 and June 2, 2020 in San Jose.  Eight plaintiffs sue the City of San Jose, eight named police officers, and other unknown officers, alleging that the police response to their actions in the protest violated their First and Fourth Amendment rights and California statutory and common law.

Now before the Court is Defendants' motion to dismiss some of the claims asserted against certain Defendants.  ECF No. 73 ("MTD"); *see also* ECF No. 78 ("Reply").  Plaintiffs oppose the motion.  *See* ECF No. 77 ("Opp.").  For the reasons stated on the record at the March 10, 2022 hearing and explained below, the motion to dismiss is GRANTED IN PART and DENIED IN PART.

## I.    BACKGROUND

### A.    Lead-Up to the Protests

As alleged in the Second Amended Complaint and accepted as true for the purposes of this motion, between May 29 and June 2, 2020, demonstrators gathered in the streets of San Jose to protest the May 25, 2020 killing of George Floyd and grieve other Black and Brown people killed by police officers.  ECF No. 68 ("SAC") ¶ 1.

United States District Court<br>Northern District of California

Plaintiffs allege that those in charge of the City police response to the protests, including Defendants Chief Edgardo Garcia and Captain Jason Dwyer, authorized the use of police techniques including "kettling"—confining a large group of people by surrounding them on all sides and preventing their escape—and the use of "less-lethal" weapons, such as rubber bullets, foam batons, and bean bag rounds, to achieve physical force while reducing (but not eliminating) the possibility of lethal force. SAC ¶¶ 53–58. Less-lethal weapons cause injury, especially when fired from distances less than fifteen feet or at the groin, head, neck, or chest. *Id.* ¶¶ 59–62. Just a week before the protests, Chief Garcia authorized the use of less-lethal weapons for crowd control purposes, which had previously been prohibited by City policy. *Id.* ¶ 66.

Training on the use of less-lethal weapons and crowd control prior to the protests was insufficient and infrequent. SAC ¶ 70. Defendant Sergeant Christopher Sciba prepared training materials on the use of less-lethal weapons. *Id.* ¶ 71. A slide presentation prepared by Sciba makes no mention of de-escalation, says "Do not hesitate. Always win.", and includes a cartoon mocking shots to the groin. *Id.* ¶¶ 71–72. Chief Garcia, Captain Dwyer, Defendant Sergeant Ronnie Lopez, Defendant Sergeant Lee Tassio, and other Doe defendants authorized untrained officers to be equipped with less-lethal weapons even though they had never received training on the use of those weapons in crowd control situations. *Id.* ¶¶ 73, 76–79.

On May 29, 2020, demonstrators began assembling at around 2:00 p.m. in downtown San Jose. *Id.* ¶ 48. The protest was peaceful, but police presence increased around 4:00 p.m. when they began forming a barricade behind marching protestors. *Id.* ¶ 84. Plaintiffs allege that instead of taking appropriate action against isolated incidents of violence or threats of violence, the City police force indiscriminately deployed less-lethal weapons against peaceful protestors who had not engaged in violent conduct. *Id.* ¶ 3.

The eight Plaintiffs each allege that he or she was a victim of those police tactics in different ways and thus assert separate claims. Each is described below.

**B.    Derrick and Cayla Sanderlin**

Plaintiffs Derrick and Cayla Sanderlin, husband and wife, participated in the protests on May 29, 2020. SAC ¶ 41. At around 6:00 p.m., after becoming stuck between two lines of

converging police officers and witnessing police use of force and projectiles against peaceful protestors, Ms. Sanderlin asked her husband if they could go home because she "could not handle any more of the police brutality." *Id.* ¶ 103. Mr. Sanderlin suggested she take a walk because he wanted to stay in solidarity with other protestors. *Id.* Ms. Sanderlin met up with a friend and began walking behind officers to pray for the safety of the protestors and to keep an eye on her husband. *Id.*

At around 6:20 p.m., near the intersection of E. Santa Clara Street and 5th Street, Mr. Sanderlin put his hands in the air and implored police to stop shooting at protestors. SAC ¶ 108. Video shows that a nearby officer said, "black guy . . . trash can" to a colleague, pointing at Mr. Sanderlin. *Id.* ¶ 114. Even though Mr. Sanderlin was not a threat, Defendant Officer Michael Panighetti aimed and fired at him, striking Mr. Sanderlin in the groin. *Id.* ¶ 108. Defendant Officer Jared Yuen also fired at Mr. Sanderlin at least once. *Id.* ¶ 115. Media and civilian footage shows Mr. Sanderlin holding a carton of milk in one hand and a carboard sign saying, "We R Worthy of Life" in the other at the time he was shot. *Id.* ¶ 108. After approximately fifteen minutes of marching behind the officers and after losing sight of her husband in the crowd, Ms. Sanderlin called her husband, who told her he had just been shot. *Id.* ¶ 104.

Mr. Sanderlin was immobilized and had to be carried out of the area by bystanders. SAC ¶ 116. Ms. Sanderlin found him lying alone near First United Methodist Church, unable to walk. *Id.* Both Ms. and Mr. Sanderlin were burned by tear gas while they waited for Ms. Sanderlin's friend to get her car. *Id.* Ms. and Mr. Sanderlin hobbled through the tear gas, barely able to see, and settled at the corner of 5th Street and St. John Street, where they stopped because Mr. Sanderlin could no longer walk. *Id.* Mr. Sanderlin iced his groin with a bag of frozen okra, and they were picked up by Ms. Sanderlin's friend. *Id.* ¶¶ 115–116.

The next day, Mr. Sanderlin had an ultrasound of his scrotum to check for injury. SAC ¶ 116. The pain and swelling became worse that day as he waited for his results, so he went to the emergency room where he was admitted for emergency surgery for a ruptured testicle. *Id.* ¶ 117. After he was discharged, Mr. Sanderlin had a three-inch surgical scar and scabbing on the injured area. *Id.* Ms. Sanderlin was not allowed to accompany Mr. Sanderlin due to COVID-19

restrictions at the hospital.  *Id.*

Mr. Sanderlin's urologist has informed him that he has a high chance of sterility because of his ruptured testicle, but that he could not be sure until Mr. Sanderlin and his wife attempt to get pregnant.  SAC ¶ 144.  Ms. and Mr. Sanderlin have been forced to consult fertility specialists, who have advised them to accelerate their plans to have children.  *Id.*  Mr. Sanderlin has been forced to research freezing his sperm, but he had not healed sufficiently for months to make a sperm bank deposit.  *Id.*  Mr. Sanderlin will have to pay out-of-pocket for the deposit because his medical insurance does not cover it.  *Id.*  Ms. and Mr. Sanderlin were not able to have sexual intercourse for months due to his injury, which infringed on their marital relationship.  *Id.* ¶ 145.

### C.    Breanna Contreras

Just after 5:00 p.m. on May 29, Plaintiff Breanna Contreras and her 18-year-old sister were standing at the intersection of E. Santa Clara Street and 7th Street when they observed a commotion at the protest and saw a cloud of teargas envelope the crowd.  SAC ¶ 93.  Contreras stood tall to see over the crowd of people.  *Id.*  She suddenly felt a strong impact to her right temple and realized she had been hit with a projectile.  *Id.*  As she felt blood on her face, another man ran up to her and helped her stop the bleeding with Contreras' face mask.  *Id.*  Contreras had heard no warnings from police.  *Id.* ¶ 94.  Contreras' sister flagged down nearby EMTs, who helped Contreras clean her injury, gave her an icepack, and told her to go to the doctor.  *Id.*

The impact of the projectile caused the right side of Contreras' head to swell up, and her eye became bloody and swollen shut.  SAC ¶ 147.  The swelling lasted for more than a week and her eye was bloody for over a month.  *Id.*  The laceration on her temple scabbed over and eventually formed a quarter-sized red mark and scar.  *Id.*

### D.    Pietro di Donato

Plaintiff Pietro "Peter" di Donato participated in the protests on May 29, 2020.  SAC ¶ 41.  He joined the crowd around 3:00 p.m. after watching coverage of the protests on the local news from his home, which was only blocks from the protest.  *Id.* ¶ 49.  He marched with a group of mostly young protestors from S. 14th Street and E. Santa Clara Street to 4th Street to Highway 280, and then returned to City Hall via 4th Street.  *Id.* ¶ 49.  Defendants used tear gas, batons,

rubber bullets, and physical force to disperse the protestors along that route, including di Donato. *Id.* ¶ 50. di Donato and other protestors were blocked from leaving when police began to "herd" them by encircling them. *Id.* ¶ 51.

At around 5:00 p.m., di Donato tried to de-escalate police who were shooting at the nonviolent young people he had been marching with for hours. *Id.* ¶ 98. di Donato approached the officers at the front of the advancing line, including Officer Doe, saying, "You should not be doing this! This is wrong!" Officer Doe threatened di Donato with his baton and told him to back up. *Id.* ¶ 99. di Donato backed up a few feet, but officers shortly afterwards fired rubber bullets, flash grenades, and tear gas on him and other protestors. *Id.* At this point, di Donato resolved not to back up further in order to stand up to the use of excessive force. *Id.* ¶ 100. Officer Doe shot di Donato in his lower left leg, after which di Donato retreated to the side of the street and took cover behind a streetlamp pole. *Id.* He returned the protest shortly afterwards but walked home around 6:00 p.m. to ice his wound. *Id.* ¶ 101. di Donato photographed his wounds and preserved videos and photos of his experience at City Hall and the resulting wound. *Id.* Although he was previously an active senior who took miles-long hikes every other day and the softball-sized bruise has faded, di Donato still has pain in his lower leg for which he is under the care of a physician. *Id.* ¶ 148.

### E.   Adira Sharkey

Plaintiff Adira Sharkey also participated in the protests on May 29, 2020. SAC ¶ 41. Around 4:00 p.m., she left her apartment to walk her dog near the protest. *Id.* ¶ 86. After she walked one block, police began using tear gas on demonstrators. *Id.* She returned her dog to her apartment and circled back to the protest with her roommates. *Id.* After Sharkey returned, police officers began marching shoulder-to-shoulder and firing projectiles at protestors. *Id.* By 8:00 p.m., Sharkey regrouped with other protestors at Cesar Chavez Park. *Id.* ¶ 118. Police-fired tear gas got into her eyes and began burning them. *Id.* After other demonstrators assisted her in flushing out her eyes, Sharkey recognized some fellow protestors nearby as recent graduates of Del Mar High School, where Sharkey works. *Id.* She worried for those former students and gave them her phone number in case anything went wrong. *Id.* ¶ 119.

United States District Court
Northern District of California

1    After walking away and reentering Cesar Chavez Park, Sharkey felt the painful impact of a

2    rubber bullet on the back side of her ribs.  SAC ¶ 120.  The bullet knocked the wind out of

3    Sharkey, and she hobbled to hide behind a redwood tree.  *Id.*  The bullet made her nauseous and

4    stunned; she had thought that the park was out of the line of fire and a safe place to hide.  *Id.*

5    Sharkey believes that the bullet was a direct shot at her and not a ricochet because the next closest

6    person to her was 12 feet away and the bullet made a perfect circle-shaped injury on her skin

7    rather than an irregular shape.  *Id.*  Sharkey had difficulty inhaling for the day after the shooting,

8    and for weeks afterwards she was sore and had difficulty sleeping.  *Id.* ¶ 149.

9        **F.    Shante Thomas**

10   Plaintiff Shante Thomas watched the protests on May 30, 2020 from the window of her

11   third-story apartment overlooking E. Santa Clara Street and City Hall.  SAC ¶ 42.   At 11:45 p.m.,

12   she yelled at a police officer to stop mistreating protestors and told police that she was recording

13   them.  *Id.* ¶ 121.  Police shined their flashlights at her windows.  *Id.*  Thomas heard the blast of a

14   weapon and breaking glass as her living room window shattered in her face.  *Id.* ¶ 122.  Thomas

15   was struck in the chest with a rubber bullet and would later find 13 projectiles that scarred the

16   walls of her apartment.  *Id.*  Police officers also fired a tear gas cannister into her apartment.  *Id.*

17   Sergeant Tassio directed Officer Yuen to deploy at least three of the projectiles, and Sergeant

18   Tassio, Sergeant Lopez, Defendant Sergeant Jonathan Byers, and Defendant Officer Jonathan

19   Marshall were also present and firing or directing others to fire projectiles.  *Id.* ¶¶ 124–127.

20   The officers claimed that beer bottles were being thrown from Thomas' unit as false

21   pretext for firing at her.  *Id.* ¶¶ 127–128.  Officers told the building management of Thomas'

22   apartment building, who sent Thomas a cease-and-desist letter and demanded that she pay to

23   replace the windows.  *Id.* ¶ 128.  The Mayor's Office and bystanders with video footage have

24   become involved as Thomas tries to avoid being evicted.  *Id.* ¶¶ 129–130.

25   Thomas continues to follow-up with her doctor regarding the rubber bullet impact to her

26   chest because the impact was near her heart.  SAC ¶ 150.  Thomas was forced to spend many

27   nights at a motel before the tear gas was cleaned and her windows were fixed.  *Id.*  The invasion

28   into the sanctity of her home has made her anxious and caused her to not feel safe at home.  *Id.*

United States District Court
Northern District of California

### G.    Joseph Stukes

Plaintiff Joseph "J.T." Stukes attended the protests on June 2, 2020.  SAC ¶ 135.  He peacefully protested by holding a sign and chanting "Black Lives Matter."  *Id.*  After 8:30 p.m., police officers kettled Stukes and other protestors and attempted to drive them out of the plaza of City Hall.  *Id.*  Stukes was engaging in peaceful civil disobedience by being out after the City's 8:30 p.m. curfew.  *Id.*  Police officers allegedly targeted him and other protestors while allowing non-protestors to continue their business after the curfew.  *Id.*  Dozens of officers rushed at Stukes and other protestors, and an officer tripped Stukes, bloodying Stukes' hands and knees.  *Id.* ¶ 137.  While Stukes was on the ground, officers fired at him with their less-lethal weapons.  *Id.* ¶ 138.  Stukes was struck from the back on his left hip and right leg with 40 mm foam batons.  *Id.*  A bean bag round ripped a hole through his closed backpack.  *Id.*  As Stukes got up and fled, officers deployed less-lethal weapons in his direction approximately fifty times.  *Id.*  Stukes suffered large contusions on his leg and hip from the foam batons.  *Id.* ¶ 143.  For months, he had a two or three-inch bruise on the back of his right leg where he was struck.  *Id.*

### H.    Vera Clanton

Plaintiff Vera Clanton attended the protest as a Legal Observer for the National Lawyers Guild on May 31, 2020.  SAC ¶ 132.  Legal observers, including Clanton, were at the protests to watch police in the course of their duties and to document any use of force, arrests, misconduct, or other notable activity by law enforcement.  *Id.*  Clanton observed a man getting arrested and walked over to witness and record the arrest.  *Id.* ¶ 133.  An officer yelled at her to back up (although she was already ten feet away), and she did so.  *Id.*  Officer Doe 1 "manhandled" her and slammed her to the ground, even though she told him she was a legal observer.  *Id.*  Clanton injured her knees due to the officer's conduct.  *Id.*  Clanton was arrested for violation of curfew and for resisting an officer under Cal. Pen. Code § 148.  *Id.* ¶ 134.  Clanton received a criminal citation and had to get a lawyer to defend her in court.  *Id.* ¶ 151.  After several months, her attorney was able to get the District Attorney to review her case and drop it.  *Id.*  Her knees still cause her discomfort and she is emotionally distressed by her mistreatment by the police.  *Id.*

United States District Court
Northern District of California

### I.    Subsequent Events

Following the protests, the City police department issued an After Action report that was submitted to the City Council in September 2020.  SAC ¶ 69.  The police department identified several overarching issues that affected the response to the protests.  *Id.*  The police department found that academy training and mandated annual training were insufficient, that the department lacked proper staffing, and that the department needed to update its policies and procedures.  *Id.*

### J.    This Lawsuit

The claims asserted by Plaintiffs in the operative complaint are summarized below:

| # | CLAIM[1] | DEFENDANT(S)[2] | SAC ¶¶ |
|---|---|---|---|
| **Derrick Sanderlin** | | | |
| 1 | § 1983 (1A) | Garcia, Dwyer, Yuen, Panighetti | 154–159 |
| 9 | § 1983 (4A) | Garcia, Dwyer, Yuen, Panighetti | 202–207 |
| 20 | Bane Act | City, Yuen, Panighetti | 271–274 |
| 28 | IIED | City, Yuen, Panighetti | 303–307 |
| **Cayla Sanderlin** | | | |
| 2 | § 1983 (1A) | Garcia, Dwyer | 160–165 |
| 10 | § 1983 (4A) | Garcia, Dwyer | 208–213 |
| 21 | Bane Act | City | 275–278 |
| 29 | IIED | City | 308–312 |
| 36 | Loss of consortium | City, Panighetti | 343–347 |
| **Breanna Contreras** | | | |
| 3 | § 1983 (1A) | Garcia, Dwyer | 166–171 |
| 11 | § 1983 (4A) | Garcia, Dwyer | 214–219 |
| 22 | Bane Act | City | 279–282 |
| 30 | IIED | City | 313–317 |

---

[1] 1A = First Amendment; 4A = Fourth Amendment; Bane Act = Cal. Civ. Code § 52.1; IIED = intentional infliction of emotional distress
[2] Claims 1–16 and 20–36 are also asserted against unnamed Doe defendants.

United States District Court
Northern District of California

| # | CLAIM[1] | DEFENDANT(S)[2] | SAC ¶¶ |
|---|---|---|---|
| **Pietro di Donato** | | | |
| 4 | § 1983 (1A) | Garcia, Dwyer, Yuen | 172–177 |
| 12 | § 1983 (4A) | Garcia, Dwyer, Yuen | 220–225 |
| 23 | Bane Act | City, Yuen | 283–286 |
| 31 | IIED | City, Yuen | 318–322 |
| **Adira Sharkey** | | | |
| 5 | § 1983 (1A) | Garcia, Dwyer | 178–183 |
| 13 | § 1983 (4A) | Garcia, Dwyer | 226–231 |
| 24 | Bane Act | City | 287–290 |
| 32 | IIED | City | 323–327 |
| **Joseph Stukes** | | | |
| 6 | § 1983 (1A) | Garcia, Dwyer | 184–189 |
| 14 | § 1983 (4A) | Garcia, Dwyer | 232–237 |
| 25 | Bane Act | City | 291–294 |
| 33 | IIED | City | 328–332 |
| **Shante Thomas** | | | |
| 7 | § 1983 (1A) | Garcia, Dwyer, Yuen, Byers, Lopez, Tassio, Marshall | 190–195 |
| 15 | § 1983 (4A) | Garcia, Dwyer, Yuen, Byers, Lopez, Tassio, Marshall | 238–243 |
| 26 | Bane Act | City, Yuen, Byers, Lopez, Tassio, Marshall | 295–298 |
| 34 | IIED | City, Yuen, Byers, Lopez, Tassio, Marshall | 333–337 |
| **Vera Clanton** | | | |
| 8 | § 1983 (1A) | Garcia, Dwyer, Doe 1 | 196–201 |
| 16 | § 1983 (4A) | Doe 1 | 244–247 |
| 19 | *Monell* (4A) | City | 260–270 |
| 27 | Bane Act | City, Doe 1 | 299–302 |
| 35 | IIED | City, Doe 1 | 338–342 |

| # | CLAIM[1] | DEFENDANT(S)[2] | SAC ¶¶ |
|---|---|---|---|
| **All Plaintiffs** | | | |
| 17 | *Monell* (1A) | City | 248–253 |
| 18 | *Monell* (4A) | City | 254–259 |

Plaintiffs filed the original complaint on July 18, 2020.  ECF No. 1.  Plaintiffs filed a First Amended Complaint on January 19, 2021.  ECF No. 38.  On June 29, 2021, the Court granted in part with leave to amend in part and denied in part Defendants' motion to dismiss the First Amended Complaint.  *See Sanderlin v. City of San Jose*, 2021 WL 2662094 (N.D. Cal. June 29, 2021) ("*Sanderlin I*").  Plaintiffs filed the operative complaint on August 30, 2021.  *See* SAC.  The Court held a hearing on Defendants' motion to dismiss that complaint on March 10, 2022.  *See* ECF No. 80.

## II.    LEGAL STANDARD

"A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim upon which relief can be granted 'tests the legal sufficiency of a claim.'"  *Conservation Force v. Salazar*, 646 F.3d 1240, 1241–42 (9th Cir. 2011) (quoting *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001)).  When determining whether a claim has been stated, the Court accepts as true all well-pled factual allegations and construes them in the light most favorable to the plaintiff.  *Reese v. BP Expl. (Alaska) Inc.*, 643 F.3d 681, 690 (9th Cir. 2011).  However, the Court need not "accept as true allegations that contradict matters properly subject to judicial notice" or "allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences."  *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008) (internal quotation marks and citations omitted).  While a complaint need not contain detailed factual allegations, it "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  A claim is facially plausible when it "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id*.  On a motion to dismiss, the Court's review is limited to the face of the complaint and matters judicially noticeable.  *MGIC Indem. Corp. v. Weisman*, 803 F.2d 500, 504 (9th Cir. 1986); *N. Star Int'l v.*

United States District Court
Northern District of California

10

1    *Ariz. Corp. Comm'n*, 720 F.2d 578, 581 (9th Cir. 1983).

2    **III.   DISCUSSION**

3        **A.   Conceded Arguments**

4        The Court first notes that two of Defendants' arguments are conceded.  First, Defendants

5    argue that all claims asserted against Captain Dwyer by Thomas, Clanton, and Stukes must be

6    dismissed because Plaintiffs have only alleged that Captain Dwyer was present at the protests on

7    May 29.  MTD at 8–9 (citing SAC ¶ 91).  Second, Defendants argue that the claims asserted by di

8    Donato must be dismissed as to Officer Yuen because di Donato has not alleged that Officer Yuen

9    caused his injury.  MTD at 18–19.  Plaintiffs agree to voluntarily dismiss both sets of claims

10   without prejudice and clarify that di Donato's claims should be alleged against a Doe officer.

11   Opp. at 1.

12       The Court accepts Plaintiffs' concession.  Accordingly, claims 6, 7, 8, 14, and 15 are

13   DISMISSED WITHOUT PREJUDICE as to Captain Dwyer.  Claims 4, 12, 23, and 31 are

14   DISMISSED WITHOUT PREJUDICE as to Officer Yuen, and in an amended pleading those

15   claims may be pled against Officer Doe 2, who must be named.[3]  *See infra* Section III.E.

16       **B.   Chief Garcia**

17       Defendants next argue that all claims asserted against Chief Garcia in his personal capacity

18   must be dismissed because Plaintiffs do not allege that he was personally present at the protests

19   and no facts support his supervisory liability.  MTD at 6–8.  Plaintiffs urge the Court to accept a

20   theory of supervisory liability.  Opp. at 11–14.

21       In its previous order, the Court dismissed the claims against Chief Garcia with leave to

22   amend because (1) "[t]here [wa]s no allegation that Chief Garcia was involved in the protests in a

23   personal capacity," and (2) there were insufficient facts to support the inference that he was the

24   final decisionmaker regarding the response to the protests.  *Sanderlin I*, 2021 WL 2662094, at *2.

25   The Court finds that the claims against Chief Garcia in his personal capacity are now adequately

26   pled.

27

28   _____

[3] Because the Court dismisses the claims as to Officer Yuen, it need not reach Officer Yuen's
argument that he is entitled to qualified immunity.  *See* MTD at 19.

United States District Court
Northern District of California

United States District Court
Northern District of California

1

2

3

4

5

6

7

8

9

"[S]upervisors may be [individually] liable for the constitutional violations of their subordinates 'when culpable action, or inaction, is directly attributed to them.'" *NAACP of San Jose/Silicon Valley v. City of San Jose*, --- F. Supp. 3d ----, 2021 WL 4355339, at *8 (N.D. Cal. Sep. 24, 2021) (quoting *Starr v. Baca*, 652 F.3d 1202, 1205 (9th Cir. 2011)).  This is true "if there exists either (1) his or her personal involvement in the constitutional deprivation, or (2) a sufficient causal connection between the supervisor's wrongful conduct and the constitutional violation."  *Starr*, 652 F.3d at 1205.  It is unnecessary for Chief Garcia to be "directly and personally involved in the same way as are the individual officers who are on the scene inflicting constitutional injury."  *Id.* at 1205–06.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

The Court finds that Plaintiffs have alleged sufficient facts regarding Chief Garcia to support an inference of a "causal connection" between his conduct and Plaintiffs' alleged constitutional injuries.  *Starr*, 652 F.3d at 1205.  Plaintiffs allege that Chief Garcia "was responsible for the hiring, screening, training, retention, supervision, discipline, counseling, and control" of all City police officers and that he "promulgat[ed] . . . the policies and procedures" relevant to the conduct alleged in the complaint.  SAC ¶ 23.  Specifically, Chief Garcia is alleged to have authorized use of the "kettling" technique for crowd control during the protests.  *Id.* ¶ 53.  He is also allegedly responsible for the policy authorizing the use of "skip fired" munitions that are designed to hit the ground first before hitting the intended target.  *Id.* ¶ 63.  A week before the protest, Chief Garcia also sent a memo to all City police personnel regarding a revision to the police duty manual that "now allowed 40mm projectile impact weapons in crowd control situations, which had previously been prohibited."  *Id.* ¶ 66.  Plaintiffs also allege that the department, led by Chief Garcia, had "recently implemented a new strategy of zero tolerance for violence or property damage" when it learned about the planned George Floyd protests the day before they began.  *Id.* ¶¶ 67–68.  Based on these facts, the Court finds that there is a reasonable inference to be drawn that there is a "causal connection" between Chief Garcia's actions in promulgating certain policies (including policy changes) in close proximity to the protests and Plaintiffs' constitutional injuries.

28

In a case brought by different plaintiffs but arising out of the same protests, another court

12

in this district reached the same conclusion regarding Chief Garcia. *See NAACP*, 2021 WL 4355339, at *8–9. There, Judge Hamilton found that all of the plaintiffs had alleged they "were either targeted with impact munitions or chemical agents and/or arrested under a challenged curfew order," and that Chief Garcia and other supervisory defendants had "adopted specific policies for a curfew and to allow expanded use of dangerous riot weapons." *Id.* This made the inference of a causal connection between Chief Garcia's actions and the constitutional violations appropriate at the pleading stage. Drawing the contrary inference against Plaintiffs—"that the police chief was not meaningfully aware of either the department's plan for responding to the protests or the degree to which the conduct of the officers involved in these high-profile incidents conformed to that plan"—would "not be appropriate . . . at the pleading stage." *Id.* at *9 (quoting *Martinez v. City of Santa Rosa*, 499 F. Supp. 3d 748, 750 (N.D. Cal. 2020). The Court agrees with the analysis in *NAACP* and will not dismiss the claims against Chief Garcia at this stage of the case.[4]

Accordingly, Defendants' motion to dismiss all claims as to Chief Garcia is DENIED.

### C.   First Amendment Claims

Defendants next move to dismiss Plaintiff's § 1983 claims asserting violations of the First Amendment (claims 1–8) pursuant to Rule 12(b)(6) and qualified immunity. MTD at 12. Defendants argue that Plaintiffs' First Amendment claims are based on the practice of kettling, which they say the law clearly establishes is permissible. *Id.* Plaintiffs urge the Court to draw inferences that several other courts in this district have—that allegations of widespread unconstitutional police activity against allegedly peaceful protestors create the inference that the police acted with retaliatory motive. Opp. at 23–24. As explained below, the Court finds that the First Amendment claims are not as narrowly drawn as Defendants argue. Thus, the Court finds that the claims are adequately pled and that Defendants are not entitled to qualified immunity at

---

[4] The Court notes that this case is distinguishable from *Ochoa v. City of San Jose*, 2021 U.S. Dist. LEXIS 226380, at *29–33 (N.D. Cal. Nov. 17, 2021), in which this Court dismissed claims against Chief Garcia based on a community briefing video that occurred after a single arrest. Plaintiffs allege that Chief Garcia was far more involved in the extensive protests here than he was in the single incident that was the subject of the complaint in *Ochoa*.

1    this stage of the case.

2                  **i.**     **Pleading Sufficiency**

3         To state a claim for retaliatory violation of the First Amendment, Plaintiffs must plead (1)

4 they were engaged in a constitutionally protected activity; (2) Defendants' actions would "chill a

5 person of ordinary firmness from continuing to engage in the protected behavior;" and (3) "the

6 protected activity was a substantial or motivating factor in [Defendants'] conduct." *Index*

7 *Newspapers LLC v. U.S. Marshals Serv.*, 977 F.3d 817, 827 (2020). The final element can be

8 demonstrated "through direct or circumstantial evidence" and "involves questions of fact that

9 should normally be left for trial." *NAACP*, 2021 WL 4355339, at *10 (citing *Index Newspapers*,

10 977 F.3d at 827).

11         The Court finds the claims adequately pled. Defendants appear to only contest the third

12 prong—whether Plaintiffs' conduct was a "substantial or motivating factor" in their response to

13 the protests. *See* MTD at 12 (purpose of a skirmish line was "to maintain order during a protest"

14 and "move protestors participating in an unlawful assembly"). Plaintiffs have pleaded adequate

15 facts supporting an inference that the widespread use of force against mostly peaceful protestors

16 was aimed at "intimidating protestors to deter [their] speech," which was anti-police in focus. *See*

17 *NAACP*, 2021 WL 4355339, at *10; *see also Don't Shoot Portland v. City of Portland*, 465 F.

18 Supp. 3d 1150, 1155–56 (D. Or. 2020) (inference warranted from allegations that "officers

19 indiscriminately used force against peaceful protestors on multiple occasions," "fire[d] tear gas

20 canisters as people attempted to leave the protest area," and subjected protestors to "rubber bullets,

21 tear gas, and a flash bang grenade at close range . . . as [they tried] to comply with officers'

22 orders"); *Black Lives Matter Seattle-King Cnty. v. City of Seattle*, 466 F. Supp. 3d 1206, 1214

23 (W.D. Wash. 2020) (inference warranted from use of "indiscriminate weapons" against all

24 protestors and "excessive amount" of chemical agents).

25         Here, Plaintiffs have offered similar allegations. For example, Sharkey has alleged that she

26 was shot with a rubber bullet as she walked into Cesar Chavez Park but was not confronting police

27 officers. SAC ¶ 120. Contreras has alleged that she was shot for merely peering over a crowd to

28 view the deployment of tear gas against another group of protestors. *Id.* ¶ 93. di Donato alleges

he was shot at while he was backing up and saying to officers, "You should not be doing this. This is wrong!" *Id.* ¶ 99.  Thomas has alleged that multiple officers fired into her apartment as she videotaped the police's response to protests.  *Id.* ¶ 122.  Stukes has alleged that police harassed protestors for being out after curfew but allowed non-protestors to walk around without police attention.  *Id.* ¶ 135.  And Clanton has alleged that an officer "manhandled" her as she videotaped an arrest from a distance in the course of her duties as a legal observer.  *Id.* ¶ 133.  Plaintiffs have also alleged that during the course of the response on May 29 alone, police used thirty-one pepper ball projectiles, thirty-two tear gas cannisters, and at least 400 foam batons or rubber bullets.  *Id.* ¶ 91.  This exhausted "most" of the City's less-lethal and chemical weapons munitions, requiring an "emergency purchase of more munitions." *Id.* ¶ 92.  And Plaintiffs throughout their complaint allege indiscriminate use of tear gas and other less-lethal weapons against protestors.  *See, e.g.*, *id.* ¶¶ 51, 55, 87, 93, 98, 103, 118.  These allegations plausibly establish that protestors' protected First Amendment activity was a substantial or motivating factor in Defendants' conduct, and the claims are thus adequately pled.

Defendants' motion to dismiss the § 1983 claims asserting violations of the First Amendment (claims 1–8) on pleading sufficiency grounds is DENIED.

### ii.    Qualified Immunity

"The doctrine of qualified immunity protects government officials from liability for civil damages 'unless a plaintiff pleads facts showing (1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct.'" *Wood v. Moss*, 572 U.S. 744, 757 (2014) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011)); *see also Saucier v. Katz*, 533 U.S. 194, 201 (2001) (establishing the two-part test). "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable [official] that his conduct was unlawful in the situation he confronted." *Saucier*, 533 U.S. at 202.

The Supreme Court has repeatedly reiterated the longstanding principle that "the clearly established right must be defined with specificity." *City of Escondido v. Emmons*, 139 S. Ct. 500, 503 (2019).  Defining the right at too high a level of generality "avoids the crucial question

United States District Court
Northern District of California

1    whether the official acted reasonably in the particular circumstances that he or she faced." *District*

2    *of Columbia v. Wesby*, 138 S. Ct. 577, 590 (2018) (quoting *Plumhoff v. Rickard*, 572 U.S. 765,

3    779 (2014)).  "[A] defendant cannot be said to have violated a clearly established right unless the

4    right's contours were sufficiently definite that any reasonable official in the defendant's shoes

5    would have understood that he was violating it."  *Plumhoff*, 572 U.S. at 779.  There can be "the

6    rare 'obvious case,' where the unlawfulness of the [official's] conduct is sufficiently clear even

7    though existing precedent does not address similar circumstances."  *Vazquez v. Cnty. of Kern*, 949

8    F.3d 1153, 1164 (9th Cir. 2020) (quoting *Wesby*, 138 S. Ct. at 590).  The relevant inquiry is

9    "whether the [official] had fair notice that her conduct was unlawful."  *Nicholson v. City of Los*

10   *Angeles*, 935 F.3d 685, 690 (9th Cir. 2019) (quoting *Kisela v. Hughes*, 138 S. Ct. 1148, 1152

11   (2018) (per curiam)).

12          The Court will now analyze the two prongs of the qualified immunity analysis.

13                  *a.   Prong One – Violation of a Constitutional Right*

14          Under a Prong One analysis on a motion to dismiss, Defendants are entitled to qualified

15   immunity unless Plaintiffs "plead[] facts showing that [Defendants] violated a statutory or

16   constitutional right."  *Wood*, 572 U.S. at 757.  The Court has already concluded that Plaintiffs

17   have pled viable First Amendment retaliation claims against Defendants by alleging indiscriminate

18   use of less-lethal weapons against mostly peaceful protestors.  *See supra* Section III.C.i.

19   Accordingly, prong one of the analysis is met.

20                  *b.   Prong Two – Clearly Established Law*

21          At Prong Two of the qualified immunity analysis on a motion to dismiss, Plaintiffs must

22   "plead[] facts showing . . . the right [violated] was 'clearly established' at the time of the

23   challenged conduct."  *Wood*, 572 U.S. at 757.  "[A] defendant cannot be said to have violated a

24   clearly established right unless the right's contours were sufficiently definite that any reasonable

25   official in the defendant's shoes would have understood that he was violating it."  *Plumhoff*, 572

26   U.S. at 779.

27          Contrary to Defendants' arguments otherwise, the law clearly establishes that the right to

28   protest on public streets and sidewalks and use verbal criticism of police conduct is protected by

United States District Court
Northern District of California

16

the First Amendment.  *See City of Houston v. Hill*, 482 U.S. 451, 461 (1987) (yelling obscenities and threats at a police officer is protected under First Amendment); *Collins v. Jordan*, 110 F.3d 1363, 1371 (9th Cir. 1996) (right to protest on city streets and sidewalks protected since "time immemorial" and restrictions on that conduct are "subject to a particularly high degree of scrutiny").  Plaintiffs have alleged conduct similar to those cases.  They allege that they protested at City Hall and on the surrounding public streets to protest the killing of George Floyd and to "grieve the police murders of other Black and Brown people."  *See* SAC ¶¶ 1, 38–39.  Plaintiffs have alleged that they "expressed anti-police and anti-excessive use of force sentiment during their demonstrations," and that it was in response to these viewpoints that Defendants "declared an unlawful assembly and used force" against them.  *Id.* ¶ 40.  Accepting these allegations as true, the Court cannot say as a matter of law that Defendants are entitled to qualified immunity on the First Amendment claims.

Because the Court cannot conclude on the basis of Plaintiff's pleading alone that Defendants are entitled to qualified immunity, their motion to dismiss the § 1983 claims alleging violation of the First Amendment (claims 1–8) is DENIED.  Because this finding is based solely on the allegations in Plaintiffs' pleading, this finding is without prejudice to Defendants raising a qualified immunity defense to these claims later in this case.

### D.  Qualified Immunity for Captain Dwyer

Defendants' next argument is that all claims against Captain Dwyer should be dismissed because he is entitled to qualified immunity.  MTD at 9–11.  Defendants characterize Plaintiffs' allegations against Captain Dwyer as limited to authorization of "kettling" and issuing the unlawful assembly declaration on May 29 and say that no clearly established law says that those actions are unconstitutional.  *Id.*  Plaintiffs rely primarily on *Nelson v. City of Davis*, 685 F.3d 867 (9th Cir. 2012), as law clearly establishing the basis for their § 1983 claims for violation of the Fourth Amendment.  Opp. at 20–22.  The Court analyzes the two prongs of the qualified immunity analysis on the § 1983 claims asserted against Captain Dwyer based on violations of the First and Fourth Amendments (claims 1–15).

United States District Court
Northern District of California

i.      **First Amendment Claims Against Captain Dwyer – Claims 1–8**

The Court has already concluded that no defendant is entitled to qualified immunity on Plaintiffs' § 1983 claims based on violation of the First Amendment.  *See supra* Section III.C.ii.  This conclusion includes Captain Dwyer.

ii.      **Fourth Amendment Claims Against Captain Dwyer – Claims 9–15**

a.   *Prong One – Violation of a Constitutional Right*

Under a Prong One analysis on a motion to dismiss, Captain Dwyer is entitled to qualified immunity unless Plaintiffs "plead[] facts showing that [Captain Dwyer] violated a statutory or constitutional right."  *Wood*, 572 U.S. at 757.  The Court first notes the difficulty in analyzing this issue for multiple Plaintiffs, each of whom alleges different circumstances and experiences in the protests.  *See NAACP*, 2021 WL 4355339, at *7 ("[M]any of the factual allegations are specific to each plaintiff and not amenable to a blanket ruling of qualified immunity.").  Because Captain Dwyer's request for qualified immunity is not directed at claims brought by specific Plaintiffs, the Court will similarly analyze the qualified immunity claim globally.

As an initial matter, Captain Dwyer urges the Court to disregard Plaintiffs' allegations that Captain Dwyer planned the response to the demonstration and that he was responsible for making the call to use less-lethal weapons on May 29.  MTD at 9.  But it would be improper for the Court to ignore these allegations, which (contrary to Defendants' arguments otherwise) are not conclusory.  Plaintiffs have alleged, among other facts, that Captain Dwyer himself stated that he "made the call" on May 29 at 5:00 p.m. to declare an unlawful assembly in what he characterized as a "war zone."  SAC ¶ 91.  Captain Dwyer further urges the Court to restrict its analysis to single actions he took—such as authorizing "kettling," MTD at 9—but that is misplaced.  The Court will not parse out single types of conduct for qualified immunity where Plaintiffs have alleged more.

Now to the Fourth Amendment analysis.  The Court notes that it recently concluded that an individual plaintiff who was shot and injured by a less-lethal weapon during the George Floyd protests had plausibly pleaded a violation of his Fourth Amendment rights.  *See Johnson v. City of San Jose*, 2022 WL 799424, at *4–6 (N.D. Cal. Mar. 16, 2022).  The Court undergoes the same analysis here and reaches the same conclusion.

First, Plaintiffs have provided plausible allegations that they were "seized" within the meaning of the Fourth Amendment by officers at the direction of Captain Dwyer.  "[A]pplication of physical force to the body of a person with intent to restrain is a seizure even if the person does not submit and is not subdued."  *Johnson*, 2022 WL 799424, at *5 (citing *Torres v. Madrid*, 141 S. Ct. 989, 1003 (2021)).  Plaintiffs here have alleged such facts.  Multiple Plaintiffs have alleged that they were shot with less-lethal weapons and that their movement was then significantly impaired.  *See, e.g.*, SAC ¶¶ 93 (Contreras:  shot in the temple with a projectile, requiring assistance from sister to walk down the street and attention from EMTs for the injury), 116 (Derrick Sanderlin:  shot in the groin, requiring help from bystanders to get out of the area and from his wife to get to a car), 120 (Sharkey:  shot in back side of ribs with rubber bullet and "hobbled" to hide and catch her breath).  Drawing inferences in Plaintiffs' favor, these allegations are sufficient to support the inference that officers had an objective "intent to restrain" Plaintiffs. *Torres*, 141 S. Ct. at 1003.

Second, Plaintiffs have plausibly alleged an unreasonable and excessive use of force under the *Graham* factors by officers at the direction of Captain Dwyer.  Analysis of the reasonableness of force under the Fourth Amendment involves a totality of the circumstances inquiry.  Courts first consider the governmental interests at stake, such as "(1) the severity of the crime at issue, (2) whether the suspect posed an immediate threat to the safety of the officers or others, and (3) whether the suspect was actively resisting arrest or attempting to evade arrest by flight."  *Torres v. Madera*, 648 F.3d 1119, 1124 (9th Cir. 2011) (citing *Graham*, 490 U.S. at 396).  On the other side, courts also consider the plaintiff's interests by looking to the "type and amount of force inflicted" and "the severity of injuries" experienced by the plaintiff.  *Felarca v. Birgeneau*, 891 F.3d 809, 817 (9th Cir. 2018).

The Court finds that Plaintiffs' allegations plausibly establish the use of excessive force. The Court first examines the governmental interests at stake.  On the first *Graham* factor—the severity of the crime at issue—Plaintiffs have alleged that they participated in protected First Amendment activity against police violence and that they were not committing acts of violence. SAC ¶¶ 1–2.  Plaintiffs allege and recognize that a single water bottle was thrown, *id.* ¶ 3, but

United States District Court
Northern District of California

1  further allege that officers did not respond "appropriately" to that "isolated incident" and instead

2  "indiscriminately" used less-lethal weapons against peaceful protestors, *id.*  On the second

3  factor—whether Plaintiffs presented an immediate threat to the safety of the officers or others—

4  multiple Plaintiffs have alleged that they either had their hands up or were either stationary or

5  walking away from officers.  *Id.* ¶¶ 93 (Contreras: peering over a crowd), 108 (Derrick Sanderlin:

6  hands in the air "implor[ing] police not to continue shooting protestors), 120 (Sharkey: walking

7  toward park away from police).  On the third factor—resisting or evading arrest—no Plaintiff has

8  alleged that he or she was charged with any crime or that any officer attempted to arrest him or her

9  (aside from Clanton, who alleges that her arrest was unlawful).

10  As to Plaintiffs' interest factors—the type and amount of force used and the injuries

11  inflicted—they further weigh in favor of a finding of excessive force based on their allegations.

12  Plaintiffs have alleged that despite their peaceful protest, Captain Dwyer declared an unlawful

13  assembly and authorized the indiscriminate use of less-lethal weapons against them.  SAC ¶¶ 81,

14  91.  Plaintiffs allege that the projectiles left varying degrees of injuries that hobbled them in the

15  immediate aftermath and continue to affect them to this day.  *Id.* ¶¶ 144–149.  Each of these

16  factors suggests that the force used was unreasonable.  *Nelson v. Davis*, 685 F.3d 867, 878–79 (9th

17  Cir. 2012) (excessive force where nonviolent plaintiff partygoer was struck with pepperball in eye,

18  causing multiple surgeries, temporary blindness, and a permanent loss of visual acuity).

19  Considering the totality of the circumstances in the pleading, Plaintiffs have plausibly

20  alleged an unreasonable use of force under the *Graham* factors.  Accordingly, at this stage of the

21  case, Plaintiffs adequately plead a violation of their Fourth Amendment rights.

22  *b.  Prong Two – Clearly Established Right*

23  At Prong Two of the qualified immunity analysis on a motion to dismiss, Plaintiffs must

24  "plead[] facts showing . . . the right [violated] was 'clearly established' at the time of the

25  challenged conduct."  *Wood*, 572 U.S. at 757.

26  Plaintiffs point primarily to *Nelson* as clearly establishing that by authorizing officers to

27  fire less-lethal weapons at them in the midst of an allegedly unlawful assembly where Plaintiffs

28  were not imminent threats to officers, resulting in injuries restricting their movements, Captain

Dwyer authorized officers to seize Plaintiffs and use excessive force against them in violation of clearly established law.  In *Nelson*, the Ninth Circuit affirmed denial of an officer's bid for qualified immunity in an excessive force case.  The student had attended a 1,000-person party at the University of California, Davis, to which police officers were summoned to break it up.  *Nelson*, 685 F.3d at 872–73.  Officers gathered in the breezeway of the apartment complex and gave dispersal orders, but recognized that they could not be heard over the din of the party.  *Id.* at 873–74.  A group of students, including the plaintiff, attempted to leave but were blocked in the breezeway by officers.  *Id.* at 874.  Although some bottles were thrown in the area, officers knew that no one from plaintiff's group threw them.  *Id.*  Officers fired at the group with pepperball guns; plaintiff was struck in the eye and immobilized.  *Id.*  He suffered temporary blindness, required multiple surgeries, and was forced to withdraw from U.C. Davis after losing his athletic scholarship.  *Id.*  The Ninth Circuit affirmed denial of qualified immunity, finding that the plaintiff was seized when he was struck by the projectile and "rendered immobile," and that the use of force was excessive under *Graham*.  *Id.* at 875–87.

The Court has previously confronted and agreed with this comparison to *Nelson* in similar circumstances as here.  *See Johnson*, 2022 WL 799424, at *6–8.  In that case, the Court noted that the case was "strikingly similar" to what happened to the *Nelson* plaintiff.  *Id.*  The same is true of many of the Plaintiffs here.  Captain Dwyer allegedly declared an unlawful assembly and authorized officers to confront large crowds of protestors with less-lethal weapons, which were fired at the protestors even though no one saw them commit acts of violence.  Plaintiffs were hit with projectiles from less-lethal weapons, resulting in restriction of their movement and long-term injuries.  These facts are quite similar to *Nelson*, and so Captain Dwyer had fair notice that those actions would be unlawful.  *Nicholson*, 935 F.3d at 690.

In *Johnson*, the Court rejected the same attempts to distinguish *Nelson* that Captain Dwyer offers here based on the confined space in *Nelson*.  Reply at 3–4.  Captain Dwyer argues that *Nelson* is distinguishable because when the unlawful assembly was declared in *Nelson*, the crowd was confined to the apartments, whereas the crowds here were highly dispersed.  *Id.*  But that is not an entirely accurate characterization of *Nelson*.  The party in *Nelson* involved approximately

21

1,000 people who were "congregated" at the apartment complex and spilled onto "the street on which the apartment complex was located." *Nelson*, 685 F.3d at 872–73.  Although not as spread out as a few city blocks, the police response in *Nelson* also occurred in more than just a single confined area.  The Court finds that, at the pleading stage, this single weak factual distinction does not make this case different enough from *Nelson*.

\*        \*        \*

Accordingly, the Court finds that Captain Dwyer is not entitled to qualified immunity at this stage of the case on any of the federal claims asserted against him.  Thus, his motion to dismiss Plaintiffs' § 1983 claims alleging violations of the First and Fourth Amendments is DENIED.  Because this finding is based solely on the allegations in Plaintiffs' pleading, this finding is without prejudice to Captain Dwyer raising a qualified immunity defense to these claims later in this case.

### E.    Federal Claims Against Doe Defendants

Defendants next argue that the Court must dismiss all federal claims (claims 1–16) against the unnamed Doe police officer defendants for failure to state a claim for relief.  MTD at 11.  Only Clanton alleges that a specific officer (Doe 1) took unconstitutional action against her[5] and that all other claims merely name "Does 1–100" without specifying any actions that particular Doe Defendants took against them.  *Id.*  Plaintiffs recognize that use of Doe Defendants is disfavored in federal court but argue that it would be premature to dismiss them because they have not yet finished reviewing discovery produced by the City that may allow them to identify specific officers.  Opp. at 22–23.

The Court finds that dismissal of the Doe Defendants at this juncture is premature.  Plaintiffs are correct that while use of "Doe" to identify a defendant is "generally disfavored, 'situations arise . . . where the identity of alleged defendants will not be known prior to the filing of a complaint.'"  *Merino v. Cnty. of Santa Clara*, 2019 WL 2437176, at \*12 (N.D. Cal. Jun. 11, 2019) (quoting *Gillespie v. Civiletti*, 629 F.2d 637, 642–43 (9th Cir. 1980)).  In those cases,

---

[5] Plaintiffs have also clarified that a different specific officer—Doe 2—is the Defendant who allegedly took actions against di Donato.  *See supra* Section III.A.

United States District Court
Northern District of California

plaintiffs "should be given an opportunity through discovery to identify the unknown defendants, unless it is clear that discovery would not uncover the identities, or that the complaint would be dismissed on other grounds." *Merino*, 2019 WL 2437176, at *12 (quoting *Gillespie*, 629 F.2d at 642–43). That is precisely what is occurring here. Counsel for Plaintiffs represented at the hearing that multiple paralegals and attorneys are reviewing voluminous video footage produced by the City in discovery and are making efforts to identify specific police officers who committed the acts alleged in the complaint. Counsel for Plaintiffs anticipated that that review would take an additional month or two to complete. The Court declines to dismiss any Doe defendants simply because they are unnamed while Plaintiffs are completing their review of the video footage. The Doe Defendants, however, cannot remain unnamed in perpetuity. It would be unfair to Defendants to continue the use of Doe monikers throughout the entire discovery process because it could expose Defendants to boundless discovery. *Accord* Reply at 5. The Court will thus require Plaintiffs to name specific defendants within the reasonable time discussed at the hearing.

Defendants' motion to dismiss all federal claims asserted against Doe Defendants (claims 1–16) is DENIED. Plaintiffs' counsel SHALL continue its diligent review of discovery produced by the City to attempt to name the Doe Defendants. Failure to identify the Doe Defendants in an amended complaint **no later than June 3, 2022** will result in *sua sponte* dismissal of the Doe Defendants. *Sua sponte* dismissal would also include Does 1 and 2 if not identified by that deadline.

### F.   Cayla Sanderlin's Bane Act Claim

Defendants also move to dismiss Cayla Sanderlin's Bane Act claim, the twenty-first claim asserted in the SAC, because she has not alleged that she was subjected to any threat or violence by a police officer. MTD at 12–13. Plaintiffs contend that the Bane Act is based on the same conduct that underpins her § 1983 claims. Opp. at 25.

Under the Bane Act, a plaintiff can seek damages "if a person or persons, whether or not acting under color of law, interferes by threat, intimidation, or coercion, or attempts to interfere by threat, intimidation, or coercion, with the exercise or enjoyment by any individual or individuals of rights secured by the Constitution or laws of the United States, or of the rights secured by the

1    Constitution or laws of this state." Cal. Civ. Code § 52.1(b)-(c).  "The essence of a Bane Act

2    claim is that the defendant, by the specified improper means (i.e., 'threats, intimidation or

3    coercion'), tried to or did prevent the plaintiff from doing something he or she had the right to do

4    under the law or to force the plaintiff to do something that he or she was not required to do under

5    the law." *Simmons v. Superior Court*, 7 Cal. App. 5th 1113, 1125 (2016).

6         The Court finds that Ms. Sanderlin's Bane Act claim is adequately pled at this juncture.

7    As Plaintiffs argue, her claim is based on the same conduct that underlies her § 1983 claims

8    asserting violation of her First and Fourteenth Amendment rights, not anything to which only her

9    husband was subjected.  These allegations include being subjected to kettling by two lines of

10   police officers "with officers from each line each telling her to go in the opposite direction,"

11   resulting in her allegedly "unreasonable detention."  SAC ¶ 102.  Ms. Sanderlin also alleges that

12   police fired projectiles at her as she sought her husband, although she does not allege that she was

13   hit.  *Id.* ¶ 106.  Ms. Sanderlin further alleges that as she attempted to pull her injured husband to

14   safety, police officers deployed tear gas against her and husband that "burned [her] eyes and

15   throat[], causing [her] to cough" and lose most of her ability to see and forcing her and her

16   husband to "walk[] very slowly."  *Id.* ¶ 116.  At this juncture, these allegations are sufficient to

17   state a Bane Act claim, and Defendants' motion to dismiss this claim is DENIED.

18        **G.    Statutory Immunity**

19        Defendants' make two arguments for dismissal of state law claims except two (claims 20–

20   26, 28–34, 36) on the basis of statutory immunity.  First, Defendants argue that those claims as

21   asserted against the Doe Defendants should be dismissed pursuant to statutory immunity under

22   California Government Code sections 820.2 and 820.4.  MTD at 13–14.  Second, Defendants

23   argue that those claims as asserted against the City must be dismissed pursuant to statutory

24   immunity under California Government code section 815.2.  *Id.* at 15.  Plaintiffs argue that the

25   statutory immunity analysis is better suited for summary judgment when the factual record has

26   been developed.  Opp. at 25.  The Court declines to dismiss on the basis of statutory immunity.

27        As to the first argument, California Government Code sections 820.2 and 820.4

28   "immunize[] public officials from liability 'resulting from [an] act or omission where the act or

United States District Court
Northern District of California

24

omission was the result of discretion vested in [the official].'"  *Johnson*, 2022 WL 799424, at *13

(quoting Cal. Gov't Code § 820.2); *see also* Cal. Gov't Code § 820.4 ("A public employee is not

liable for his act or omission, exercising due care, in the execution or enforcement of any law.

Nothing in this section exonerates an employee from liability for false arrest or false

imprisonment.").  But as this Court recently recognized, "it has been long established that [these

provisions] do[] not apply to officers who use unreasonable force."  *Johnson*, 2022 WL 799424, at

*13 (quoting *Blankenhorn v. City of Orange*, 485 F.3d 463, 487 (9th Cir. 2007)); *see also Sharp v.

Cnty. of Orange*, 871 F.3d 901, 920 (9th Cir. 2017) (immunity does not extend to "operational

decision[s] by the police purporting to apply the law").  Because Plaintiffs' § 1983 claims for

excessive force are mostly surviving this motion, statutory immunity is not warranted.

As to the second argument, California Government Code § 815.2 states that "[e]xcept as

otherwise provided by statute, a public entity is not liable for an injury resulting from an act or

omission of an employee of the public entity where the employee is immune from liability."  Cal.

Gov't Code § 815.2(b).  Defendants' argument is that the City is immune from liability because

the Doe Defendants are statutorily immune.  Because the Court has just rejected Defendants'

argument that the Doe Defendants are entitled to statutory immunity, the City is not entitled to

immunity on this basis.

Accordingly, Defendants' motion to dismiss all state law claims except two (claims 20–26,

28–34, and 36) against Doe Defendants and the City on the basis of statutory immunity is

DENIED.

### H.    *Monell*

Defendants contend that Plaintiffs' three *Monell* claims (claims 17–19) are subject to

dismissal because they fail to allege any species of *Monell* liability.  MTD at 15–18.  Plaintiffs say

that their allegations support *Monell* liability pursuant to unconstitutional customs or policies,

failure to train, and ratification.  Opp. at 11–12.

"The Supreme Court in *Monell* held that municipalities may only be held liable under

section 1983 for constitutional violations resulting from official…policy or custom."  *Benavidez v.

Cnty. of San Diego*, 993 F.3d 1134, 1153 (9th Cir. 2021) (citing *Monell*, 436 U.S. at 694).

United States District Court
Northern District of California

"[P]olicies can include written policies, unwritten customs and practices, failure to train municipal employees on avoiding certain obvious constitutional violations, … and, in rare instances, single constitutional violations [that] are so inconsistent with constitutional rights that even such a single instance indicates at least deliberate indifference of the municipality[.]" *Id.* at 1153 (internal citations omitted). "A municipality may [also] be held liable for a constitutional violation if a final policymaker ratifies a subordinate's actions." *Lytle v. Carl*, 382 F.3d 978, 987 (9th Cir. 2004). "In order to establish liability for governmental entities under *Monell*, a plaintiff must prove '(1) that [the plaintiff] possessed a constitutional right of which [s]he was deprived; (2) that the municipality had a policy; (3) that this policy amounts to deliberate indifference to the plaintiff's constitutional right; and (4) that the policy is the moving force behind the constitutional violation.'" *Dougherty v. City of Covina*, 654 F.3d 892, 900 (9th Cir. 2011) (alterations in original) (quoting *Plumeau v. Sch. Dist. No. 40 Cnty. of Yamhill*, 130 F.3d 432, 438 (9th Cir. 1997)). Because Plaintiffs argue that their allegations support three types of *Monell* liability— custom or practice, failure to train, and ratification—the Court analyzes each species of liability separately.

### i.      Policy, Custom, or Practice

A municipality may be held liable on the basis of an unconstitutional policy if a plaintiff can "prove the existence of a widespread practice that, although not authorized by written law or express municipal policy, is 'so permanent and well settled as to constitute a "custom or usage" with the force of law.'" *City of St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988) (quoting *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 167-168 (1970)). "Liability for improper custom may not be predicated on isolated or sporadic incidents"—rather, "[t]he custom must be so persistent and widespread that it constitutes a permanent and well settled city policy." *Trevino v. Gates*, 99 F.3d 911, 918 (9th Cir. 1996) (internal citations omitted). In order to withstand a motion to dismiss for failure to state a claim, a *Monell* claim must consist of more than mere "formulaic recitations of the existence of unlawful policies, customs, or habits." *Warner v. Cnty. of San Diego*, No. 10-1057, 2011 WL 662993, at *4 (S.D. Cal. Feb. 14, 2011). Plaintiffs' allegations do not suffice to support *Monell* liability pursuant to a policy or custom for two reasons.

United States District Court
Northern District of California

First, the customs or policies that Plaintiffs identify in their pleading are nearly identical to those identified in the First Amended Complaint, save that they are now split into two causes of action instead of one. *Compare* SAC ¶¶ 249(a)–(h), 255(i)–(p), *with* ECF No. 38 ("FAC") ¶¶ 125(a)–(i). The Court previously concluded that these policies were "not supported by sufficient factual allegations" and were too general to constitute policies or customs. *Sanderlin I*, 2021 WL 2662094, at *3. The policies also still "appear to allege discretionary decisions made by the San Jose Police Department—not policy violations." *Id.* at *3; SAC ¶¶ 249(f)–(h), 255(n)–(p) (selection of specific officers to respond to the protests).[6]

Second, "an isolated or sporadic incident . . . cannot form the basis of *Monell* liability for an improper custom." *Saved Mag. v. Spokane Police Dep't*, 19 F.4th 1193, 1201 (9th Cir. 2021) (citing *Trevino*, 99 F.3d at 918) (cleaned up). Although Plaintiffs allege actions that took place over a few days in late May and early June 2020, they have not alleged any other examples of use of less-lethal weapons on protestors that preceded the George Floyd protests. Plaintiffs thus have not established that the policies or customs were "so persistent and widespread that [they] constitute[] a permanent and well settled city policy." *Trevino*, 99 F.3d at 918.

This *Monell* theory thus cannot proceed based on Plaintiffs' present allegations.

### ii.   Failure to Train

"Failure to train an employee who has caused a constitutional violation can be the basis for § 1983 liability where the failure to train amounts to deliberate indifference to the rights of persons with whom the employee comes into contact." *Long v. Cnty. of Los Angeles*, 442 F.3d 1178, 1186 (9th Cir. 2006) (citing *City of Canton v. Harris*, 489 U.S. 378, 388 (1989)). This standard is met when "the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need." *Canton*, 489 U.S. at 390. "Only where a failure to train reflects a 'deliberate' or 'conscious' choice by a municipality—a 'policy' as defined by our

---

[6] The allegation that Chief Garcia revised the Duty Manual to allow for use of less-lethal weapons for crowd control was encompassed within the policies alleged in the prior pleading, although additional allegations now support the change of policy. *Compare* SAC ¶ 66, *with* FAC ¶¶ 125(d)–(e).

United States District Court
Northern District of California

United States District Court
Northern District of California

prior cases—can a city be liable for such a failure under § 1983." *Id.* at 389.  And only under such circumstances does the failure to train constitute "a policy for which the city is responsible, and for which the city may be held liable if it actually causes injury." *Id.* at 390.  "A municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train." *Connick v. Thompson*, 563 U.S. 51, 61 (2011).  As such, "[a] pattern of similar constitutional violations by untrained employees is 'ordinarily necessary' to demonstrate deliberate indifference for purposes of failure to train." *Id.* at 62 (internal citations omitted).

The Court finds that Plaintiffs have made out a failure to train claim based on the change in policy immediately before the protest regarding the permissible uses of less-lethal weapons.  Although the policy itself might not be unconstitutional such that it could form the basis for a policy or custom *Monell* claim, Plaintiffs have adequately alleged a *Monell* claim on the basis of failure to train pursuant to that policy.  Plaintiffs have alleged that just one week before the protest, Chief Garcia sent a memo to all City police personnel informing them that the Duty Manual had been revised to permit the use of less-lethal weapons for crowd control purposes, a context in which use of those weapons was previously prohibited.  SAC ¶ 66.  Plaintiffs also allege that while there had been training (although infrequent) on the use of less-lethal weapons generally, officers were untrained on use of these weapons in a crowd control context prior to the protests.  *Id.* ¶¶ 8, 249(d)–(e).  While these allegations are sparse and failure to train claims are the "most tenuous" form of *Monell* liability, *Connick*, 563 U.S. at 61, the Court finds that the allegations are sufficient to create an inference of a failure to train.  Without training on how to constitutionally use less-lethal weapons in a crowd control situation, Plaintiffs have plausibly pled that the City was deliberately indifferent to their constitutional rights by changing the policy to allow for such uses of less-lethal weapons.

Plaintiffs have adequately alleged this species of *Monell* liability.

### iii.    Ratification

"A municipality may be held liable for a constitutional violation if a final policymaker ratifies a subordinate's actions."  *Lytle v. Carl*, 382 F.3d 978, 987 (9th Cir. 2004). "To show ratification, a plaintiff must show that the authorized policymakers approve a subordinate's

decision and the basis for it."  *Id.* (internal quotation marks and citation omitted).  The policymaker must have knowledge of the constitutional violation and actually approve of it—a failure to overrule a subordinate's actions, without more, is insufficient to support a § 1983 claim. *Id.*  In other words, ratification requires an authorized policymaker to make a "conscious, affirmative choice" to endorse subordinate's actions.  *Gillette v. Delmore*, 979 F.2d 1342, 1346-47 (9th Cir. 1992).  A policymaker's after-the-fact approval of a subordinate's conduct that caused the alleged constitutional violations may be used as evidence that a municipality had a pre-existing policy that caused the alleged constitutional violations.  *Silva v. San Pablo Police Dep't*, 805 Fed. Appx. 482, 485 (9th Cir. 2020).  To show that ratification was a "moving force" behind the constitutional deprivation, a plaintiff must demonstrate both causation in fact and proximate causation.  *Arnold v. Int'l Bus. Machs. Corp.*, 637 F.2d 1350, 1355 (9th Cir. 1981); *Dougherty v. City of Covina*, 654 F.3d 892, 900-901 (9th Cir. 2011).

Plaintiffs have alleged sufficient facts to support this theory for similar reasons as the Court found supported claims alleged against Chief Garcia.  *See supra* Section III.B.  There the Court concluded that Plaintiffs' allegations regarding Chief Garcia's control over the entire department's response to the protests and his changes to department policies leading up to the protests supported the inference that he was "either directing [the] response himself or—at the very least—ratifying the actions of his subordinates."  *See id.*; *see also NAACP*, 2021 WL 4355339, at *7–8 (*Monell* claims stated where plaintiffs made similar allegations); *Martinez*, 499 F. Supp. 3d at 750 ("reasonable to infer that the conduct of the individual officers was directed or ratified by the police chief").  These same allegations are sufficient to plausibly plead that Chief Garcia is a final policymaker for whose actions the City may be held responsible under *Monell*. *See Harper v. City of Los Angeles*, 533 F.3d 1010, 1025 (9th Cir. 2008) (Los Angeles police chief was final policymaker for City of Los Angeles); *Reasoner v. City of Pittsburg*, 2019 WL 3503066, at *10 (N.D. Cal. Aug. 1, 2019) (same, as to Chief of Police in Pittsburg).

Plaintiffs have thus made out a *Monell* claim based on ratification.

\*       \*       \*

Because Plaintiffs have adequately pled *Monell* claims under two different theories,

29

1   Defendants' motion to dismiss Plaintiffs' *Monell* claims (claims 17–19) is DENIED.

2   **IV.   ORDER**

3       For the foregoing reasons, IT IS HEREBY ORDERED that Defendants' motion to dismiss

4   is GRANTED IN PART AND DENIED IN PART as follows:

5       • Per Plaintiffs' concession, Defendants' motion to dismiss claims by Thomas, Clanton,

6         and Stukes against Captain Dwyer only (claims 6, 7, 8, 14, and 15) is GRANTED, and

7         the claims are DISMISSED WITHOUT PREJUDICE;

8       • Per Plaintiffs' concession, Defendants' motion to dismiss claims by di Donato against

9         Officer Yuen only (claims 4, 12, 23, and 31) is GRANTED, and the claims are

10        DISMISSED WITHOUT PREJUDICE to reasserting them against officer Doe 2 in an

11        amended complaint;

12      • Defendants' motion to dismiss all claims against Chief Garcia is DENIED;

13      • Defendants' motion to dismiss all § 1983 claims asserting violations of the First

14        Amendment (claims 1–8) on the basis of qualified immunity is DENIED;

15      • Defendants' motion to dismiss all federal claims against Captain Dwyer (claims 1–15)

16        on the basis of pleading sufficiency and qualified immunity is DENIED;

17      • Defendants' motion to dismiss all federal claims against the Doe Defendants (claims

18        1–15) is DENIED, but Plaintiffs SHALL no later than June 3, 2022 name the Doe

19        Defendants in an amended complaint or face *sua sponte* dismissal of the Doe

20        Defendants;

21      • Defendants' motion to dismiss Cayla Sanderlin's Bane Act claim (claim 21) is

22        DENIED);

23      • Defendants' motion to dismiss the state law claims asserted against the City and Doe

24        Defendants (claims 20–36) pursuant to statutory immunity is DENIED; and

25      • Defendants' motion to dismiss three *Monell* claims asserted against the City (claims

26        17–19) is DENIED.

27  Plaintiffs SHALL file an amended complaint **no later than June 3, 2022**.  Failure to meet the

28  deadline to file an amended complaint or failure to cure the deficiencies identified on the record or

United States District Court
Northern District of California

in this order will result in dismissal of the deficient claims with prejudice.  Amendment may not exceed the scope allowed by the Court.  Plaintiff may not add new claims or parties without express leave of Court or consent of Defendants.  Identifying the Doe Defendants by name does not constitute adding new parties.

Dated:  March 29, 2022

_____
BETH LABSON FREEMAN
United States District Judge