1
2
3            **UNITED STATES DISTRICT COURT**
4          **NORTHERN DISTRICT OF CALIFORNIA**
5               **SAN JOSE DIVISION**
6

7   DERRICK SANDERLIN, et al.,                Case No.  20-cv-04824-BLF
8                    Plaintiffs,
                                              **ORDER GRANTING IN PART AND**
9            v.                               **DENYING IN PART MOTION FOR**
                                              **SUMMARY JUDGMENT**
10  CITY OF SAN JOSE, et al.,
                                              [Re:  ECF No. 101]
11                   Defendants.

12

13        This case involves serious allegations of police misconduct in response to protests over the

14  killing of George Floyd that took place between May 29 and June 2, 2020 in San Jose.  Seven

15  remaining plaintiffs have claims against the City of San Jose (the "City") and seven named police

16  officers, alleging that the police response to their actions in the protest violated their First and

17  Fourth Amendment rights and California statutory and common law.

18        Now before the Court is Defendants' motion for summary judgment.  ECF No. 101

19  ("MSJ"); *see also* ECF No. 117 ("Reply").  Plaintiffs oppose the motion.  *See* ECF No. 113

20  ("Opp.").  The Court held a hearing on February 2, 2023.  For the reasons explained below, the

21  motion for summary judgment is GRANTED IN PART and DENIED IN PART.

22  **I.    BACKGROUND**

23        **A.    The Protests**

24        Between May 29 and June 7, 2020, demonstrators gathered in the streets of San Jose to

25  protest the May 25, 2020 killing of George Floyd and police misconduct and brutality.  *See*

26  *generally* Supplemental Declaration of Sarah Marinho, ECF No. 116 ("Marinho Supp. Decl."),

27  Ex. KK (ECF No. 116-3) ("AAR").  Plaintiffs' claims all stem from incidents that occurred at

28  those protests.

United States District Court
Northern District of California

United States District Court
Northern District of California

The San Jose Police Department ("SJPD") responded to the protests.  Officers used several types of weapons in the protests, including 40mm launchers and 37mm launchers, both of which are considered projectile impact weapons ("PIWs").  *See* AAR at 99-109.  The 40mm launchers can use a 40mm foam baton round, which is an impact projectile "used to precisely target individual suspects engaging in acts of violence in accordance with use of force criteria set forth in Duty Manual Section L 2629."  *Id.* at 101.  The 37mm launcher uses the CTS 3555 Multi 5-Foam Baton Round, which "carries a payload of 5 foam baton rounds" and "is skip fired at an angle onto the ground."  *Id.* at 104; *see also* Marinho Supp. Decl., Ex. Z (ECF No. 116-1) ("Tassio Dep. 1") at 35:6-11.  It is used for "crowd dispersal in accordance with DUTY MANUAL L 2629."  AAR at 104.  On May 31, 2020, the City instituted a curfew that was in effect from 8:30 p.m. to 5:00 a.m.  *See* Declaration of James Huang, ECF No. 100 ("Huang Decl."), Ex. 14 (curfew order).  On June 1, 2020, Police Chief Garcia released a memorandum that outlined a revision to the SJPD *Duty Manual* as it related to the use of the 37mm and 40mm PIWs.  Declaration of Sarah Marinho, ECF No. 114 ("Marinho Decl."), Ex. II (ECF No. 114-17) ("Exp. Rpt.") ¶ 59.

The seven Plaintiffs each allege that he or she was a victim of SJPD police tactics in different ways and thus assert separate claims.  Each is described below.

### B.    Plaintiffs' Experiences at the Protests

Below is a summary of the Plaintiffs' experiences at the protests, based on evidence submitted by both parties.  Not all evidence is undisputed, as will be discussed in the Discussion section below.

#### 1.    Derrick and Cayla Sanderlin

Plaintiffs Derrick and Cayla Sanderlin, husband and wife, participated in the protests on May 29, 2020.  Declaration of Derrick Sanderlin, ECF No. 113-4 ("D. Sanderlin Decl.") ¶ 3; Declaration of Cayla Sanderlin, ECF No. 113-3 ("C. Sanderlin Decl.") ¶ 3.  Ms. Sanderlin became scared for her safety in the early evening when she became trapped between two lines of SJPD officers.  C. Sanderlin Decl. ¶ 4.  The officers from those two lines issued conflicting verbal commands as to what direction she could proceed, and she felt her freedom of movement was restricted.  *Id.* ¶ 5.  At this time, she saw officers push demonstrators with batons and heard

projectiles fired, and police were using flash bang grenades. *Id.* ¶ 6. She eventually was able to make her way "out of the chaos." *Id.* She found Mr. Sanderlin and asked to go home. *Id.* ¶ 7; D. Sanderlin Decl. ¶ 4. Mr. Sanderlin suggested that Ms. Sanderlin take a walk to calm down, and he stated that he wanted to stay in solidarity with the other protestors. C. Sanderlin Decl. ¶ 7; D. Sanderlin Decl. ¶ 4. Ms. Sanderlin agreed and began to walk west. C. Sanderlin ¶ 7; D. Sanderlin ¶ 4. She met up with her friend, and they walked together. C. Sanderlin Decl. ¶ 8.

At around 6:20 p.m., near the First United Methodist Church at E. Santa Clara Street and 5th Street, Mr. Sanderlin put his hands in the air and implored police to stop shooting at protestors. D. Sanderlin Decl. ¶ 5; *see generally* Declaration of Keith Neumer, ECF No. 102 ("Neumer Decl."), Ex. A (Panighetti body warn camera video). Officer Panighetti was one of the officers in this area, and he was armed with a 40mm launcher. Huang Decl., Ex. 1 ("Panighetti Dep.") at 37. Panighetti states that, as he came up to the Santa Clara Street and 5th Street intersection, he was monitoring an individual wearing a 49ers jersey who had been throwing objects at officers. *Id.* at 38:3-12. The individual in the jersey was with one other individual, and both were hiding along the corner of a building. *Id.* at 40:3-11. Those two were holding gallon paint cans that they sought to throw at the officers, and then they pushed a dumpster onto the sidewalk and were hiding behind it. *Id.* at 40:12-41:1. A third individual, Derrick Sanderlin, was standing on the sidewalk with a sign. *Id.* Panighetti stated that Mr. Sanderlin was standing in front of the officers holding a sign, and he was preventing the officers from clearing away the threat—the two individuals behind the dumpster. *Id.* at 73:15-74:21. Mr. Sanderlin states he "was not posing a threat or invading the personal space of officers." D. Sanderlin Decl. ¶ 5. Panighetti gave Mr. Sanderlin several warnings to move, but Mr. Sanderlin did not hear him. Panighetti Dep. at 74:13-14; D. Sanderlin Decl. ¶ 6. Video shows that a nearby officer said, "black guy . . . trash can" to a colleague. Huang Decl., Ex. 17 (news channel video). Panighetti took aim and fired at Mr. Sanderlin with the 40mm launcher, striking him in the groin. D. Sanderlin Decl. ¶¶ 5-6; Panighetti Dep. at 74:13-21. Mr. Sanderlin fell to the ground, unable to move. D. Sanderlin Decl. ¶ 7. He was helped out of the area by bystanders. *Id.* ¶ 7.

Ms. Sanderlin called Mr. Sanderlin about fifteen minutes after she had left on her walk,

and he told her that he had been shot.  D. Sanderlin Decl. ¶ 4; C. Sanderlin Decl. ¶ 8.  Ms. Sanderlin found Mr. Sanderlin lying near First United Methodist Church, unable to walk.  D. Sanderlin Decl. ¶ 7; C. Sanderlin Decl. ¶ 9.  While Ms. Sanderlin's friend went to get her car, Mr. and Ms. Sanderlin were burned by tear gas.  D. Sanderlin Decl. ¶ 7; C. Sanderlin Decl. ¶ 9.  Ms. Sanderlin stated that she did not know the source of the tear gas, and there were no officers on North Fifth Street between Santa Clara Street and Saint John Street, which is where the tear gas affected her.  Huang Decl., Ex. 2 ("C. Sanderlin Dep.") at 72:19-73:4.  Tear gas was not fired directly at Mr. and Ms. Sanderlin.  *Id.* at 73:13-15.  The tear gas burned their eyes and throats, causing them to cough, so Ms. Sanderlin helped her husband to stand and walk away.  D. Sanderlin Decl. ¶ 7; C. Sanderlin Decl. ¶ 9.  They were completely engulfed by tear gas and could barely open their eyes.  D. Sanderlin Decl. ¶ 8; C. Sanderlin Decl. ¶ 9.  They stopped at the corner of 5th Street and St. John Street because Mr. Sanderlin had to lie down.  D. Sanderlin Decl. ¶ 8; C. Sanderlin Decl. ¶ 9.  Mr. Sanderlin iced his groin with a bag of frozen okra, and they were picked up by Ms. Sanderlin's friend.  D. Sanderlin Decl. ¶¶ 8-9; C. Sanderlin Decl. ¶¶ 9-10.

Mr. and Ms. Sanderlin underwent medical care.  Marinho Decl., Exs. F (Ms. Sanderlin's medical records), H-I (Mr. Sanderlin's medical records).  The day after the protest, Mr. Sanderlin had an ultrasound of his scrotum to check for injury.  D. Sanderlin Decl. ¶ 9.  The pain and swelling became worse that day as he waited for his results, so he went to the emergency room where he was admitted for emergency surgery for a ruptured testicle.  *Id.*  After he was discharged, Mr. Sanderlin had a three-inch surgical scar and scabbing on the injured area.  *Id.* ¶ 10.  Ms. Sanderlin was not allowed to accompany Mr. Sanderlin due to COVID-19 restrictions at the hospital.  *Id.* ¶ 9.

Mr. Sanderlin's urologist informed him that he has a high chance of sterility because of his ruptured testicle.  D. Sanderlin Decl. ¶¶ 10-11.  Ms. and Mr. Sanderlin have been forced to consult fertility specialists and had to accelerate their plans to have children.  *Id.*  Mr. Sanderlin has been forced to research freezing his sperm, but would have to pay out-of-pocket for the deposit because his medical insurance does not cover it.  *Id.* ¶ 11.  Ms. and Mr. Sanderlin were not able to have sexual intercourse for months due to his injury.  *Id.*

### 2. Breanna Contreras

Just after 5:00 p.m. on May 29, 2020, Plaintiff Breanna Contreras and her 18-year-old sister were standing at the intersection of E. Santa Clara Street and 7th Street when they observed a commotion at the protest and saw a cloud of teargas envelope the crowd. Declaration of Breanna Contreras, ECF No. 113-2 ("Contreras Decl.") ¶ 3. Contreras stood tall to see over the crowd of people. *Id.* She suddenly felt a strong impact to her right temple and realized she had been hit with a projectile. *Id.* She stated she had no reason to believe that she was hit for any reason other than an accident. Huang Decl., Ex. 3 ("Contreras Dep.") at 51:16-52:2.

Contreras felt blood on her face, and another man ran up to her and helped her stop the bleeding with Contreras's face mask. Contreras Decl. ¶¶ 3-4. Contreras had heard no warnings from police. *Id.* ¶ 4. Contreras's sister flagged down nearby EMTs, who helped Contreras clean her injury, gave her an icepack, and told her to go to the doctor. *Id.* ¶ 5.

The impact of the projectile caused the right side of Contreras's head to swell up, and her eye became bloody and swollen shut. Contreras Decl. ¶ 6; *see also* Marinho Decl., Exs. D (photographs of injuries), E (medical records). The swelling lasted for more than a week and her eye was bloody for over a month. Contreras Decl. ¶ 6. The laceration on her temple scabbed over and eventually formed a quarter-sized red mark and scar. *Id.*

### 3. Pietro di Donato

Plaintiff Pietro di Donato participated in the protests on May 29, 2020, joining the crowd around 3:00 p.m. after watching coverage of the protests on the local news from his home. Declaration of Pietro di Donato, ECF No. 113-6 ("Donato Decl.") ¶ 3. He marched with a group of mostly young protestors from S. 14th Street and E. Santa Clara Street to 4th Street to Highway 280, and then returned to City Hall via 4th Street. *Id.*

At around 5:00 p.m., di Donato tried to de-escalate police who were shooting at the nonviolent young people he had been marching with for hours. Donato Decl. ¶ 4. di Donato approached an officer at the front of the advancing line saying, "You should not be doing this. This is wrong!" *Id.* The officer threatened di Donato with his baton and told him to back up. *Id.* di Donato backed up a few feet, but officers shortly afterwards fired rubber bullets, flash grenades,

and tear gas on him and other protestors.  *Id.*  At this point, di Donato resolved not to back up further in protest to the use of excessive force.  *Id.* ¶ 5.  An officer shot di Donato in his lower left leg, after which di Donato retreated to the side of the street and took cover behind a streetlamp pole.  *Id.*  He did not see the officer fire the projectile.  Huang Decl., Ex. 4 ("Donato Dep.") at 14:25-15:3.  He returned to the protest shortly afterwards but walked home around 6:00 p.m. to ice his wound.  Donato Decl. ¶ 5.  Although he was previously an active senior who took miles-long hikes every other day, di Donato continued to have pain in his lower leg and was under the care of a physician for that persistent pain.  *Id.* ¶ 7; *see also* Marinho Decl., Exs. L (photograph of injury), M (medical records).

### 4.  Adira Sharkey

Plaintiff Adira Sharkey also participated in the protests on May 29, 2020.  Declaration of Adira Sharkey, ECF No. 113-1 ("Sharkey Decl.") ¶ 3.  Around 4:00 p.m., she left her apartment to walk her dog near the protest.  *Id.*  After she walked one block, police began using tear gas on demonstrators.  *Id.*  She returned her dog to her apartment and circled back to the protest with her roommates.  *Id.*

Around 8:00 p.m., Sharkey regrouped with other protestors at Cesar Chavez Park.  Sharkey Decl. ¶ 4.  Police-fired tear gas got into her eyes and began burning them.  *Id.*  After other demonstrators assisted her in flushing out her eyes, Sharkey recognized some fellow protestors nearby as recent graduates of Del Mar High School, where Sharkey works.  *Id.*  She worried for those former students and gave them her phone number in case anything went wrong.  *Id.*

After walking away and reentering Cesar Chavez Park, Sharkey felt the painful impact of a rubber bullet on the back side of her ribs.  Sharkey Decl. ¶ 5.  The bullet knocked the wind out of Sharkey, and she hobbled to hide behind a redwood tree.  *Id.*  The bullet made her nauseous and stunned; she had thought that the park was out of the line of fire and a safe place to gather.  *Id.*  Sharkey does not know which officer fired the projectile that hit her.  Huang Decl., Ex. 5 ("Sharkey Dep.") at 32:2-5.  But Sharkey believes that the bullet was a direct shot at her and not a ricochet because the next closest person to her was 12 feet away and the bullet made a perfect circle-shaped injury on her skin.  Sharkey Decl. ¶ 5; *see also* Marinho Decl., Exs. A-C

6

(photographs of injuries).  Sharkey had difficulty inhaling for the day after the shooting, she had difficulty sleeping for several nights, and for weeks afterwards she was sore.  Sharkey Decl. ¶ 6.

### 5. Joseph Stukes

Plaintiff Joseph Stukes attended the protests on June 2, 2020.  Declaration of Joseph Stukes, ECF No. 113-5 ("Stukes Decl.") ¶ 3.  He peacefully protested by holding a sign and chanting "Black Lives Matter."  *Id.*  After 8:30 p.m., police officers kettled Stukes and other protestors and attempted to drive them out of the plaza of City Hall.  *Id.*  Stukes was engaging in peaceful civil disobedience by being out after the City's curfew.  *Id.*  Police officers targeted him and other protestors while allowing non-protestors to continue their business after the curfew.  *Id.*  Dozens of officers rushed at Stukes, and an officer tripped Stukes, bloodying Stukes's hands and knees.  *Id.* ¶ 4.  While Stukes was on the ground, officers fired at him with their less-lethal weapons.  *Id.* ¶ 5.  He does not know which officer(s) shot the projectiles that hit him, noting that there were several in the vicinity.  Huang Decl., Ex. 6 ("Stukes Dep.") at 28:15-22, 50:8-10.  Stukes was struck from the back on his left hip with a 40mm foam baton, as well as the back of his right leg.  Stukes Decl. ¶ 5.  A bean bag round ripped a hole through his closed backpack.  *Id.*  As Stukes got up and fled, officers deployed less-lethal weapons in his direction approximately fifty times.  *Id.*  He suffered injuries and sought medical treatment.  *See* Marinho Decl., Exs. J (photographs of injures), K (medical records).

### 6. Vera Clanton

Plaintiff Vera Clanton attended the protest as a Legal Observer for the National Lawyers Guild on May 31, 2020.  Declaration of Vera Clanton, ECF No. 113-7 ("Clanton Decl.") ¶ 3.  As a legal observer, Clanton was at the protests to watch police in the course of their duties in a public place and to document any use of force, arrests, misconduct, or other notable activity by law enforcement.  *Id.*  Clanton observed a man getting arrested and walked over to witness and record the arrest.  *Id.*  She was warned several times by officers that there was a curfew, and she would be arrested if she did not leave, but she did not leave.  Huang Decl., Ex. 7 ("Clanton Dep.") at 34-35; Neumer Decl., Ex. B (Tassio body worn camera video); *see also* Huang Decl., Ex. 14 (curfew order).  When she did not disperse, Officer Tassio ordered other officers to arrest her.  Huang

Decl., Ex. 8 ("Tassio Dep. 2") at 88:4-89:6; Neumer Decl., Ex. B.  Officers Marshall and Avila "manhandled" her and slammed her to the ground.  Clanton Decl. ¶ 3; *see also* Neumer Decl., Exs. D, E, F (body worn camera video from various officers).  The officers used what is called a control hold arrest.  Huang Decl., Ex 9 ("Avila Dep.") at 73:15-74:3.  As a result of the arrest, her knees were injured.  Clanton Decl. ¶ 3; *see also* Marinho Decl., Ex. N (photograph of injury); Huang Decl., Ex. 16 (photograph of injury).

### C.   Officer Actions

The parties also submit evidence as to various officers' actions during the protests.

#### 1.   Chief Garcia

Edgardo Garcia became chief of the SJPD in 2016, and he was the chief at the time of the protests.  Marinho Supp. Decl., Ex. FF (ECF No. 116-2) ("Garcia Dep.") at 15:20-21.  He stated in his deposition that his source of information about the protests was his assistant chief at the time, David Knopf.  *Id.* at 18:1-3.  On May 29, 2020, the first information Garcia received from Knopf was that there was a protest and a march in the area and that it was loud but peaceful.  *Id.* at 21:9-23.  Garcia first learned that the protests were no longer peaceful around 5:00 p.m., while he was at an event near the Rose Garden.  *Id.* at 22:7-19.  He learned from Knopf that individuals "were throwing bottles and doing other things to police or other innocent bystanders."  *Id.* at 22:20-23:7.  Garcia then received a phone call from the NAACP President, Reverend Moore, who asked if SJPD wanted him to speak to protestors to try to calm things down.  *Id.* at 24:5-10.  Garcia called Knopf to ask how to get Reverend Moore to the crowd, but Knopf told him that the situation had become too dangerous to get Reverend Moore to the crowd.  *Id.* at 24:11-17.  Garcia stated that Knopf was the highest-ranking person handling the event at that point and that Garcia had delegated to Knopf to handle the situation as he saw fit.  *Id.* at 24:24-25:5.

Knopf continued to keep Garcia updated on the status of the protests.  Garcia Dep. at 26:21-27:2.  Knopf told Garcia that they needed to call the protest an unlawful assembly.  *Id.* at 27:3-20.  Garcia stated that he did not need to sign off on that decision, but he did need to be informed of it.  *Id.* at 27:12-25.  Garcia and Knopf discussed using force to disperse the crowd during several conversations.  *Id.* at 28:1-21.  Garcia stated that the conversations were about "the

United States District Court
Northern District of California

use of chemical agents"—namely tear gas—"more than anything else." *Id.* at 28:17-29:5. Garcia then stated that the use of chemical agents is something both Garcia and Knopf would have had to agree on, and Garcia could have said no to its use. *Id.* at 31:2-20. Garcia gave authorization to use gas if it was necessary. *Id.* at 31:17-22. Garcia could not remember whether he and Knopf discussed the use of PIWs on May 29, 2020. *Id.* at 31:23-32:9. He similarly could not remember whether Knopf informed him that PIWs were being used to disperse the crowd at any point on May 29, 2020. *Id.* at 33:14-18. Garcia also stated he could not remember whether he and Knopf discussed the use of LRAD to give announcements to the crowd on May 29, 2020, or whether SJPD had only one LRAD at that time. *Id.* at 34:6-12. Garcia states that after he left the event near the Rose Garden, he was off duty. *Id.* at 35:19-21.

Garcia attended briefings at the SAP Center on later days of the protests. Garcia Dep. at 36:12-21. Knopf continued to have operational control. *Id.* at 41:11-23.

### 2. Captain Dwyer

Captain Jason Dwyer was the incident commander on May 29, 2020. Garcia Dep. at 33:7-9. The incident commander needs to provide approval for the deployment of the 37mm launcher. Tassio Dep. 1 at 36:1-6. On May 29, 2020, Captain Dwyer gave Officers Price and Zeminini authorization to use the 37mm launcher. *Id.* at 37:1-12. Once Dwyer gave the authorization, it lasted for the length of the incident for which it was authorized—in this case, the protest—and it was up to the officer to decide when to fire the weapon within SJPD policy. *Id.* at 37:13-38:9. Only those two officers deployed 37mms on May 29, 2020. *Id.* at 37:1-7.

Plaintiffs submit only a brief excerpt of the deposition of Dwyer himself. *See* Marinho Supp. Decl., Ex. GG (ECF No. 114-16) ("Dwyer Dep."). This excerpt does not discuss Dwyer's role in the protests, but rather his description of the protestors. *Id.* at 68-70. He stated that the protestors were yelling "pejoratives toward law enforcement" and "the name George Floyd." *Id.* at 68:9-13. He further explained that he thought the protests "started with the George Floyd incident," but that by the time Dwyer arrived at the protests, they were "straight anti-police" and "very hateful." *Id.* at 69:7-25. Finally, he stated that the protestors were "sober minded and they were making a conscious decision to turn on the police, like, violently turn on the police." *Id.* at

9

70:16-20.

**D.    Subsequent Events**

In September 2020, the SJPD issued the "Police Department Preliminary After Action Report for the Public Protests, Civil Unrest and Law Enforcement Response from May 29th – June 7th, 2020" ("After Action Report").  *See* AAR.  The SJPD identified several issues that influenced the response to the protest, including "a lack of training and experience, insufficient staffing levels, and a need to update policies and procedures."  *See id.* at 4.

**E.    This Lawsuit**

Plaintiffs filed the original complaint on July 18, 2020.  ECF No. 1.  Plaintiffs filed a First Amended Complaint on January 19, 2021.  ECF No. 38.  On June 29, 2021, the Court granted in part with leave to amend in part and denied in part Defendants' motion to dismiss the First Amended Complaint.  *See Sanderlin v. City of San Jose*, 2021 WL 2662094 (N.D. Cal. June 29, 2021) ("*Sanderlin I*").  Plaintiffs filed the Second Amended Complaint on August 30, 2021.  ECF No. 68.  On March 29, 2022, the Court granted in part and denied in part Defendants' motion to dismiss the Second Amended Complaint.  *See Sanderlin v. City of San Jose*, 2022 WL 913055 (N.D. Cal. Mar. 29, 2022) ("*Sanderlin II*").

Plaintiffs filed a Third Amended Complaint on June 4, 2022.  ECF No. 83 ("TAC").  Since the TAC was filed, one plaintiff settled her claims.  The remaining claims are as follows:

| # | CLAIM | DEFENDANT(S) | TAC ¶¶ |
|---|---|---|---|
| **Derrick Sanderlin** | | | |
| 1 | § 1983 (1A) | Garcia, Dwyer, Yuen, Panighetti | 165–170 |
| 9 | § 1983 (4A) | Garcia, Dwyer, Yuen, Panighetti | 213–218 |
| 20 | Bane Act | City, Yuen, Panighetti | 282–285 |
| 28 | IIED | City, Yuen, Panighetti | 314–318 |
| **Cayla Sanderlin** | | | |
| 2 | § 1983 (1A) | Garcia, Dwyer | 171–176 |
| 10 | § 1983 (4A) | Garcia, Dwyer | 219–224 |

| # | CLAIM | DEFENDANT(S) | TAC ¶¶ |
|---|---|---|---|
| 21 | Bane Act | City | 286–289 |
| 29 | IIED | City | 319–323 |
| 36 | Loss of consortium | City, Panighetti | 354–358 |
| **Breanna Contreras** | | | |
| 3 | § 1983 (1A) | Garcia, Dwyer | 177–182 |
| 11 | § 1983 (4A) | Garcia, Dwyer | 225–230 |
| 22 | Bane Act | City | 290–293 |
| 30 | IIED | City | 324–328 |
| **Pietro di Donato** | | | |
| 4 | § 1983 (1A) | Garcia, Dwyer | 183–188 |
| 12 | § 1983 (4A) | Garcia, Dwyer | 231–236 |
| 23 | Bane Act | City | 294–297 |
| 31 | IIED | City | 329–333 |
| **Adira Sharkey** | | | |
| 5 | § 1983 (1A) | Garcia, Dwyer | 189–194 |
| 13 | § 1983 (4A) | Garcia, Dwyer | 237–242 |
| 24 | Bane Act | City | 298–301 |
| 32 | IIED | City | 334–338 |
| **Joseph Stukes** | | | |
| 6 | § 1983 (1A) | Garcia | 195–200 |
| 14 | § 1983 (4A) | Garcia | 243–248 |
| 25 | Bane Act | City | 302–305 |
| 33 | IIED | City | 339–343 |
| **Vera Clanton** | | | |
| 8 | § 1983 (1A) | Garcia | 207–212 |
| 16 | § 1983 (4A) | Tassio, Avila, Marshall | 255–258 |

| # | CLAIM | DEFENDANT(S) | TAC ¶¶ |
|---|---|---|---|
| 19 | *Monell* (4A) | City | 271–281 |
| 27 | Bane Act | City, Tassio, Avila, Marshall | 310–313 |
| 35 | IIED | City, Tassio, Avila, Marshall | 349–353 |
| **All Plaintiffs** | | | |
| 17 | *Monell* (1A) | City | 259–264 |
| 18 | *Monell* (4A) | City | 265–270 |

On December 29, 2022, Defendants filed the instant motion for summary judgment on all claims. *See* MSJ.

## II. LEGAL STANDARD

"A party is entitled to summary judgment if the 'movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *City of Pomona v. SQM N. Am. Corp.*, 750 F.3d 1036, 1049 (9th Cir. 2014) (quoting Fed. R. Civ. P. 56(a)). "The moving party initially bears the burden of proving the absence of a genuine issue of material fact." *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 387 (9th Cir. 2010) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). "Where the non-moving party bears the burden of proof at trial, the moving party need only prove that there is an absence of evidence to support the non-moving party's case." *Id.* (citing *Celotex*, 477 U.S. at 325).

"Where the moving party meets that burden, the burden then shifts to the non-moving party to designate specific facts demonstrating the existence of genuine issues for trial." *Oracle*, 627 F.3d at 387 (citing *Celotex*, 477 U.S. at 324). "[T]he non-moving party must come forth with evidence from which a jury could reasonably render a verdict in the non-moving party's favor." *Id.* (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)). "The court must view the evidence in the light most favorable to the nonmovant and draw all reasonable inferences in the nonmovant's favor." *City of Pomona*, 750 F.3d at 1049 (citing *Clicks Billiards Inc. v. Sixshooters Inc.*, 251 F.3d 1252, 1257 (9th Cir. 2001)). "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Id.* at 1049-50 (quoting *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587

(1986)).

### III.    DISCUSSION

#### A.    Intentional Infliction of Emotional Distress (Claims 28-33, 35)

Defendants seek summary judgment as to each Plaintiff's claim for intentional infliction of emotional distress. MSJ at 23-24. Plaintiffs do not contest that summary judgment as to these claims is proper. *See* Opp. At the hearing, Plaintiffs confirmed that they have conceded these claims. The Court therefore GRANTS summary judgment to Defendants on all claims for intentional infliction of emotional distress (Claims 28-33, 35).

#### B.    Defendant Yuen (Claims 1, 9, 20, 28)

Officer Yuen seeks summary judgment as to all claims naming him as Defendant. *See* MSJ at 6. He stated in his deposition that he did not shoot Derrick Sanderlin in the groin. Huang Decl., Ex. 11 ("Yuen Dep.") at 75:21-76:22. Derrick Sanderlin provides no evidence to contradict this, and the description given by Derrick Sanderlin of the officer that shot him does not match that of Yuen. *See* Huang Decl., Ex. 10 ("D. Sanderlin Dep.") at 91:1-11; MSJ at 6. The Court therefore GRANTS Defendant Yuen's motion for summary judgment as to all claims in which he was named (Claims 1, 9, 20, and 28).

#### C.    Fourth Amendment Claims (Claims 9-14, 16)

Defendants seek summary judgment on each of the seven Plaintiff's Section 1983 claims alleging violation of their Fourth Amendment rights. Two of the Plaintiffs have identified the officers that used excessive force against them, while the other five have not. Those five Plaintiffs bring their excessive force claims against Chief Garcia and Captain Dwyer, or only Garcia. The Court will first address those five Plaintiffs as a group, and then it will address each of the other two Plaintiffs individually.

On all seven claims, Defendants assert qualified immunity. *See* MSJ at 6-18. "In evaluating a grant of qualified immunity, a court considers whether (1) the state actor's conduct violated a constitutional right and (2) the right was clearly established at the time of the alleged misconduct." *Gordon v. Cnty. of Orange*, 6 F.4th 961, 967-68 (9th Cir. 2021). Defendants contest both prongs, arguing that they are entitled to summary judgment because (1) Plaintiffs

1    cannot establish a constitutional violation, and (2) they are entitled to qualified immunity because

2    they did not violate clearly established law.  *See* MSJ at 6-18.  "Either question [of the qualified

3    immunity test] may be addressed first, and if the answer to either is 'no,' then the state actor

4    cannot be held liable for damages."  *Gordon*, 6 F.4th at 968 (citing *Pearson v. Callahan*, 555 U.S.

5    223, 236 (2009)).

6    **1.  Plaintiffs Cayla Sanderlin, Breanna Contreras, Pietro di Donato, Adira
     Sharkey, and Joseph Stukes ("Group Plaintiffs") (Claims 10-14)**

7    Plaintiffs Cayla Sanderlin, Breanna Contreras, Pietro di Donato, and Adira Sharkey

8    brought Fourth Amendment excessive force claims against Chief Garcia and Captain Dwyer, and

9    Plaintiff Joseph Stukes brought a Fourth Amendment excessive force claim against Chief Garcia

10   alone.  *See* TAC ¶¶ 219-48.  Defendants assert that without evidence identifying the specific

11   officers who struck them or used any force against them, they cannot prove a constitutional

12   violation under *Graham v. Connor*.  MSJ at 6-7.  Defendants further argue that the Group

13   Plaintiffs' claims against Garcia and Dwyer fail because Plaintiffs cannot show that Garcia and

14   Dwyer violated a clearly established right.  *Id.* at 15-18.

15   "A defendant may be held liable as a supervisor under § 1983 'if there exists either (1) his

16   or her personal involvement in the constitutional deprivation, or (2) a sufficient causal connection

17   between the supervisor's wrongful conduct and the constitutional violation.'"  *Starr v. Baca*, 652

18   F.3d 1202, 1207 (9th Cir. 2011) (quoting *Hansen v. Black*, 885 F.2d 642, 646 (9th Cir. 1989)).

19   Group Plaintiffs argue that Garcia and Dwyer are liable both as integral participants in the

20   constitutional deprivations and because there was "a sufficient causal connection" between their

21   conduct and the alleged constitutional violations.  *See* Opp. at 9-10, 19-21.

22   Under either theory of liability, there must of course be a constitutional deprivation, and

23   Defendants assert there was not.  The Court will therefore first address whether the Group

24   Plaintiffs were seized and, if so, whether the officers used excessive force.  It will then address

25   whether Garcia and Dwyer can be held liable for any constitutional deprivation, either as integral

26   participants or through a causal connection.  Finally, the Court will address qualified immunity.

27

28

United States District Court
Northern District of California

14

a.  Constitutional Deprivation

Defendants argue that Plaintiffs cannot prove a constitutional violation by any subordinate officer.  MSJ at 6-7, 16.

1.  Seizure

"A person is seized by the police and thus entitled to challenge the government's action under the Fourth Amendment when the officer by means of physical force or show of authority terminates or restrains his freedom of movement through means intentionally applied."  *Brendlin v. California*, 551 U.S. 249, 254 (2007) (internal quotation marks and citations omitted).  "[T]he application of physical force to the body of a person with intent to restrain is a seizure, even if the person does not submit and is not subdued."  *Torres v. Madrid*, 141 S. Ct. 989, 1003 (2021).  "Accidental force will not qualify."  *Id.* at 998.  And "the appropriate inquiry is whether the challenged conduct *objectively* manifests an intent to restrain."  *Id.* (emphasis in original).  If a plaintiff does not show "an unambiguous intent to restrain," then they "must prove that in view of all of the circumstances surrounding the incident, a reasonable person would have believed that [they were] not free to leave."  *Jackson-Moeser v. Armstrong*, 765 F. App'x 299, 299 (9th Cir. 2019) (internal quotation marks and citations omitted).  In seizures by show of authority, a seizure only occurs if the subject does yield.  *California v. Hodari D.*, 499 U.S. 621, 626 (1991) ("An arrest requires *either* physical force (as described above) *or*, where that is absent, *submission* to the assertion of authority." (emphasis in original)).

Four of the Group Plaintiffs—Breanna Contreras, Pietro di Donato, Adira Sharkey, and Joseph Stukes—assert that they were seized when they were shot with projectiles.  Defendants argue that Plaintiffs cannot show an unambiguous intent to restrain, nor can they show that they were not free to leave.  Reply at 4-6.  Plaintiffs point the Court to *Nelson v. City of Davis*, 685 F.3d 867 (9th Cir. 2012), in which the Ninth Circuit applied the intentionality requirement of *Brendlin v. California*.  The Ninth Circuit addressed whether there was a seizure where police officers fired pepperball guns towards a group of students at a party.  *Id.* at 873-74.  The plaintiff in the case had been hit in the eye with a projectile fired from one of the pepperball guns.  *Id.* at 875.  The Ninth Circuit stated that "[t]he intentionality requirement is satisfied when the

United States District Court
Northern District of California

1  'termination of freedom of movement [occurs] *through means intentionally applied*.'" *Id.* at 876

2  (quoting *Brower v. Cnty. of Inyo*, 489 U.S. 593, 597 (1989)) (emphasis in original).  The Court

3  determined there was a seizure because the officers "took aim and intentionally fired in the

4  direction of a group of which Nelson was a member." *Id.* at 875.  The officers argued that there

5  was no seizure because the plaintiff "was not individually targeted by officers." *Id.* at 876.  But

6  the Ninth Circuit disagreed with this argument, noting that the plaintiff and other students "were

7  the undifferentiated objects of shots intentionally fired by the officers in the direction of that

8  group." *Id.* at 877.

9        The situation here is similar.  Plaintiffs Contreras, di Donato, Sharkey, and Stukes have

10  provided evidence sufficient to create a dispute of fact as to whether they were impacted by

11  projectiles from weapons that were intentionally fired by officers.  They need not prove that they

12  were the intended targets of those shots under *Nelson*.  And under *Jackson-Moeser*, they need not

13  show that they were not free to leave if they can show the force was intentionally applied.

14  Defendants argue that this case is distinguishable from *Nelson* because there, the plaintiff's

15  freedom of movement was actually limited.  Reply at 5.  But the Supreme Court's decision in

16  *Torres* indicates that, for a seizure to occur, the individual need not actually submit or be subdued

17  when force is applied.  Therefore, the Court determines that Plaintiffs Breanna Contreras, Pietro di

18  Donato, Adira Sharkey, and Joseph Stukes have shown a dispute of fact as to whether they were

19  seized.

20        Plaintiff Cayla Sanderlin's theory on her Fourth Amendment claim is somewhat unclear.

21  The briefing suggests that it may stem from either (1) when she got stuck between two lines of

22  SJPD officers or (2) when she was impacted by tear gas.  *See* Opp. at 11.  She cannot succeed

23  under either theory.  The first would be considered a seizure by a show of authority.  In such

24  instances, a seizure occurs only if the subject yields to the authority.  *Hodari D.*, 499 U.S. at 626.

25  From the evidence submitted by Cayla Sanderlin, it appears that she was able to, and did, walk

26  away.  *See* C. Sanderlin Decl. ¶ 6.  As to the second theory—tear gas—Cayla Sanderlin states that

27  she walked into an area where tear gas was already present.  C. Sanderlin Dep. at 72-73.  She

28  therefore cannot show that the officers intentionally applied tear gas to her.  Plaintiff Cayla

Sanderlin therefore cannot show she was seized.

## 2. Excessive Force

Analysis of the reasonableness of force under the Fourth Amendment involves a totality of the circumstances inquiry.  Courts first consider the governmental interests at stake, such as "(1) the severity of the crime at issue, (2) whether the suspect posed an immediate threat to the safety of the officers or others, and (3) whether the suspect was actively resisting arrest or attempting to evade arrest by flight." *Torres v. City of Madera*, 648 F.3d 1119, 1124 (9th Cir. 2011) (citing *Graham v. Connor*, 490 U.S. 386, 396 (1989)).  On the other side, courts also consider the plaintiff's interests by looking to the "type and amount of force inflicted" and "the severity of injuries" experienced by the plaintiff.  *Felarca v. Birgeneau*, 891 F.3d 809, 817 (9th Cir. 2018).

The Court first examines the governmental interests at stake.  On the first *Graham* factor—the severity of the crime—Plaintiffs were participating in protected First Amendment activity against police violence.  There is no evidence that any of the Group Plaintiffs was committing any acts of violence.  On the second factor—whether Plaintiffs presented an immediate threat to the safety of the officers or others—there is no evidence that Group Plaintiffs were threatening officer safety.  And on the third factor—resisting or evading arrest—there is no evidence that any of the Group Plaintiffs was charged with any crime or that any officer attempted to arrest any of them.  As to Plaintiffs' interest factors—the type and amount of force used and the injuries inflicted—they further weigh in favor of a finding of excessive force.  The Plaintiffs were hit with projectiles.  And the use of the weapons left them with injuries.

Therefore, four of the Group Plaintiffs—Contreras, di Donato, Sharkey, and Stukes—have shown a genuine dispute of material fact as to whether there was an unreasonable use of force under the *Graham* factors based on a totality of the circumstances.  Plaintiff Cayla Sanderlin has not.  The Court will next address whether Defendants Garcia and Dwyer can be held liable for these violations under either of the Plaintiffs' theories of liability.

### b. Garcia and Dwyer's Liability

Defendants further claim that Group Plaintiffs have no evidence that Garcia or Dwyer caused a constitutional violation through deliberate indifference and Group Plaintiffs cannot

17

establish that Garcia or Dwyer violated a constitutional right.  MSJ at 15-18.  Plaintiffs provide

two theories by which they argue Garcia and Dwyer are liable for their constitutional violations:

integral participation and causal connection.  Opp. at 9-10, 19-21.  The Court will address each in

turn.

### 1.   Integral Participation

Defendants argue that Garcia and Dwyer cannot be held liable as integral participants

because there is no evidence Garcia and Dwyer had any involvement in the Group Plaintiffs'

alleged constitutional violations.  Reply at 1-3.  Group Plaintiffs assert that "[t]he SJPD officers at

the protests" can be held liable as integral participants in the constitutional deprivation.  Opp. at 9-

10.

"'[I]ntegral participation' does not require that each officer's actions themselves rise to a

level of a constitutional violation."  *Boyd v. Benton Cnty.*, 374 F.3d 773, 780 (9th Cir. 2004).  But

any officer who is an "integral participant" in the constitutional deprivation can be held liable.  *Id.*

"Officers are not integral participants simply by the virtue of being present at the scene of an

alleged unlawful act."  *Monteilh v. Cnty. of Los Angeles*, 820 F. Supp. 2d 1081, 1089 (C.D. Cal

2011) (citing *Jones v. Williams*, 297 F.3d 930, 936 (9th Cir. 2002)).  "Instead, integral

participation requires some *fundamental involvement* in the conduct that allegedly caused the

violation."  *Id.* (citing *Jones*, 297 F.3d at 936) (emphasis in original).  "Officers are fundamentally

involved in the alleged violation when they provide some affirmative physical support at the scene

of the alleged violation and when they are aware of the plan to commit the alleged violation or

have reason to know of such a plan, but do not object."  *Id.* (collecting cases).  "Additionally,

officers may be integral participants even if they have no knowledge of a plan to commit the

alleged violation if their physical participation in the alleged violation was part of a closely related

series of physical acts leading to the violation."  *Id.* at 1089 n.10 (citing *Blankenhorn v. City of

Orange*, 485 F.3d 463, 481 n.12 (9th Cir. 2007)).

Here, Group Plaintiffs have not provided evidence indicating that Garcia and Dwyer were

integral participants in their alleged constitutional deprivations.  There is evidence that Garcia was

not present at the protests on May 29, 2020.  *See* Garcia Dep. at 22.  And there is no evidence that

18

Garcia was present on June 2, 2020.  And Dwyer was present at the protests at least on May 29, 2020, but Plaintiffs have provided no evidence that he was involved with, or even in the vicinity of, any of the shootings of the Group Plaintiffs.

The cases relied on by Plaintiffs are distinguishable.  First, in *Rutherford v. City of Berkeley*, the plaintiff alleged that several officers, "without any provocation and without placing him under arrest, . . . threw him to the ground, punched, kicked, and handcuffed him."  780 F.2d 1444, 1445 (9th Cir. 1986).  At trial, the plaintiff identified Officers Hood, McBride, and Houpt as the officers who assaulted him, but he later stated he was not sure whether those officers actually kicked or punched him.  *Id.*  The plaintiff confirmed that "while he was on the ground being beaten he saw the faces of the named officers."  *Id.*  The court directed a verdict in favor of the defendants because the plaintiff had not offered proof that any of those individual defendants had beaten him.  *Id.* at 1445-46.  The Ninth Circuit overturned, noting that the plaintiff "did testify that [Hood, McBride, and Houpt] were among the five or six officers who were surrounding him while he was being beaten and that he saw each of their faces while he was being beaten."  *Id.* at 1448.  And the Ninth Circuit further noted that those three officers admitted they "were among the five or six officers who detained, arrested and handcuffed [the plaintiff], but denied punching or kicking [him]."  *Id.*  The Ninth Circuit determined that, based on this evidence, "a jury could reasonably infer that the named officers were participants in punching or kicking [the plaintiff]."  *Id.*

Plaintiff also points to *Boyd v. Benton County*, 374 F.3d 773.  In that case, a group of officers executed a search warrant at the plaintiff's home and used a flash-bang device.  *Id.* at 777-78.  All of the officers were aware of the plan to use the flash-bang and did not object.  *Id.* at 777.  The plaintiff brought an excessive force claim, and the court determined that, viewing the facts in the light most favorable to the plaintiff, the use of force was constitutionally excessive.  *Id.* at 779.  Defendants argued that only the officer who deployed the flash-bang should be liable.  *Id.* at 780.  And the Ninth Circuit disagreed, stating that "each officer involved in the search operation was an 'integral participant.'"  *Id.* at 780.  The Ninth Circuit noted that (1) the other officers stood armed behind the officer who deployed the flash-bang while he did so; (2) "the use of the flash-bang was part of the search operation in which every officer participated in some meaningful way"; and (3)

1 "every officer was aware of the decision to use the flash-bang, did not object to it, and participated

2 in the search operation knowing the flash-bang was to be deployed." *Id.*

3       Defendants Garcia and Dwyer were not involved in the Group Plaintiffs' alleged

4 constitutional violations in the same manner as the officers in *Rutherford* or *Boyd*.  As stated

5 above, Plaintiffs have provided no evidence that Garcia was present at the protests.  And while

6 Dwyer was present at the protests, Plaintiffs have provided no evidence he was in the vicinity of

7 any of the locations of their alleged constitutional violations.  And even if he was in the vicinity,

8 they have provided no evidence that he was involved in the decisions made to shoot them, or in

9 the carrying out of those shootings.  Plaintiffs have not shown that either Garcia or Dwyer was an

10 integral participants in their alleged constitutional violations.

11       Defendants Garcia and Dwyer are not liable as integral participants for any of the Group

12 Plaintiffs.

13                   2.   Causal Connection

14       Defendants argue that they are entitled to summary judgment because Group Plaintiffs do

15 not have any evidence showing that Garcia and Dwyer are liable as supervisors based on a causal

16 connection.  MSJ at 16-18.  Group Plaintiffs assert that Defendants Garcia and Dwyer can be held

17 liable as supervisors because there is a sufficient causal connection between their wrongful

18 conduct and the constitutional violations.  Opp. at 19-21.

19       As stated above, "[a] defendant may be held liable as a supervisor under § 1983 'if there

20 exists . . . a sufficient causal connection between the supervisor's wrongful conduct and the

21 constitutional violation.'"  *Starr*, 652 F.3d at 1207 (quoting *Hansen*, 885 F.2d at 646).  To succeed

22 under this theory, Group Plaintiffs "must show (1) that an officer used excessive force against

23 them, and (2) the requisite causal connection between that officer, on the one hand, and [the

24 supervising officers], on the other."  *Felarca*, 891 F.3d at 821 (citing *Jackson v. City of

25 Bremerton*, 268 F.3d 646, 653-54 (9th Cir. 2001); *Starr*, 652 F.3d at 1207).  The Court already

26 addressed the first prong, excessive force, above.  The Court therefore turns to whether Plaintiffs

27 have provided evidence that there was a causal connection between the acts of Garcia and Dwyer

28 and the acts of the officers who caused the alleged constitutional deprivations.  "The requisite

United States District Court
Northern District of California

20

United States District Court
Northern District of California

causal connection can be established by setting in motion a series of acts by others, or by knowingly refusing to terminate a series of acts by others, which the supervisor knew or reasonably should have known would cause others to inflict a constitutional injury."  *Felarca*, 891 F.3d at 820 (quoting *Starr*, 652 F.3d at 1207-08).  "A supervisor can be liable in his individual capacity for his own culpable action or inaction in the training, supervision, or control of his subordinates; for his acquiescence in the constitutional deprivation; or for conduct that showed a reckless or callous indifference to the rights of others."  *Starr*, 652 F.3d at 1208 (quoting *Watkins v. City of Oakland*, 145 F.3d 1087, 1093 (9th Cir. 1998)).

The evidence as to Garcia and Dwyer is summarized in the Background section, above.  First, the main evidence as to the role of Chief Garcia is an excerpt from his deposition.  *See Garcia Dep.*  In the excerpt, Garcia discusses his conversations with Assistant Chief Knopf on May 29, 2020.  *See id.*  Garcia states that he authorized the use of tear gas as necessary.  *Id.* at 31. He also states that he was informed that the officers would be calling the protest an unlawful assembly.  *Id.*  Garcia indicates that he could not remember if he spoke with Knopf about PIWs on that day.  *Id.* at 31-33.  Plaintiffs' evidence does not create a dispute of fact as to whether there was a causal connection between Garcia's actions and any deprivation of Group Plaintiffs' constitutional rights.  *See* Reply at 14 (summarizing Plaintiffs' evidence as to Garcia).  Garcia did not set in motion a series of acts that he knew or reasonably should have known would lead to any of the Group Plaintiffs' alleged constitutional violations.  He authorized the use of tear gas as necessary.  Tear gas did not cause any of the constitutional deprivations at issue here—the four Group Plaintiffs who can possibly show constitutional deprivations were hit by projectiles.  And further, Group Plaintiffs provide no evidence that Garcia knew or should have known that any weapons would be used in a way that would be constitutionally suspect.  Garcia is therefore not liable for any constitutional violations as a supervisor.

Second, the Court will address Plaintiffs' evidence as to Captain Dwyer.  Dwyer was the incident commander on May 29, 2020.  Garcia Dep. at 33:7-9.  As incident commander, he provided authorization for use of certain less-lethal weapons.  Tassio Dep. 1 at 36-38.  The evidence shows that on May 29, 2020, SJPD officers declared the protest an unlawful assembly

and gave dispersal orders.  AAR at 41, 48.  Plaintiffs state that this order was made by Dwyer.

Opp. at 21, 23.  The Court determines that there are disputed facts as to Dwyer's acts as incident

commander on May 29, 2020.  And the Court determines that, looking at the evidence in the light

most favorable to Plaintiffs, a reasonable jury could determine that Dwyer set in motion a series of

events that he knew, or reasonably should have known, would lead to excessive force being used

against peaceful protestors in violation of their Fourth Amendment rights.

Plaintiffs have shown disputed facts such that summary judgment for Dwyer is improper as

to the Fourth Amendment claims of Breanna Contreras, Pietro di Donato, and Adira Sharkey.  The

Court next turns to Dwyer's assertion of qualified immunity.

### c.   Qualified Immunity

Dwyer argues that he is entitled to qualified immunity.  MSJ at 15-18.  The Court must

"consider whether the law was clearly established at the time of the challenged conduct."  *Felarca*,

891 F.3d at 816 (citing *Sjurset*, 810 F.3d at 615).  And "the clearly established right must be

defined with specificity."  *Emmons*, 139 S. Ct. at 503.

Here, the Court finds that granting qualified immunity to Dwyer turns on accepting

Defendant's version of disputed facts, so qualified immunity is not appropriate at present.  *See*

*Estate of Aguirre v. Cnty. of Riverside*, 29 F.4th 624, 630 (9th Cir. 2022) (holding "[c]ritical

disputes of fact render[ed] summary judgment premature" in police violence case where police

claimed qualified immunity); *Espinosa v. City & Cnty. of San Francisco*, 598 F.3d 528, 532 (9th

Cir. 2010) (affirming denial of summary judgment on qualified immunity grounds because there

were genuine issues of fact regarding whether the officers violated plaintiff's Fourth Amendment

rights, which were also material to a proper determination of the reasonableness of the officers'

belief in the legality of their actions).

Here, looking at the facts in the light most favorable to Plaintiffs, the question is whether it

was clearly established that an officer could not shoot a projectile at an individual who was

peacefully protesting.  In *Nelson*, the Ninth Circuit affirmed denial of an officer's bid for qualified

immunity in an excessive force case.  As discussed above, the plaintiff had attended a large party

at his university, and police officers were summoned to break it up.  *Nelson*, 685 F.3d at 872-73.

United States District Court
Northern District of California

Officers gathered in the breezeway of the apartment complex and gave dispersal orders but recognized that they could not be heard over the din of the party. *Id.* at 873-74. A group of students, including the plaintiff, attempted to leave but were blocked in the breezeway by officers. *Id.* at 874. Although some bottles were thrown in the area, officers knew that no one from plaintiff's group threw them. *Id.* Officers fired at the group with pepperball guns; plaintiff was struck in the eye and immobilized. *Id.* He suffered temporary blindness, required multiple surgeries, and was forced to withdraw from U.C. Davis after losing his athletic scholarship. *Id.* The Ninth Circuit affirmed denial of qualified immunity, finding that the plaintiff was seized when he was struck by the projectile and "rendered immobile," and that the use of force was excessive under *Graham*. *Id.* at 875–87.

Here, officers shot projectiles at Breanna Contreras, Pietro di Donato, and Adira Sharkey, even though they were not engaged in any violence towards the police, although others around them may have been. Under Plaintiffs' version of events, the officers had notice that shooting of these Plaintiffs would be unconstitutional. Therefore, Plaintiffs' evidence, if credited by the jury, would support a finding that Dwyer violated a clearly established right by setting in motion these constitutional violations. *Cf. Felarca*, 891 F.3d at 823 (conducting qualified immunity analysis for supervisory liability). The Court therefore determines that Dwyer is not entitled to qualified immunity.

\* \* \* \* \*

The Court GRANTS Defendant Garcia's motion for summary judgment as to Claims 10-14. The Court GRANTS Defendant Dwyer's motion for summary judgment as to Claim 10. The Court DENIES Defendant Dwyer's motion for summary judgment as to Claims 11-13.

### 2. Plaintiff Vera Clanton (Claim 16)

Defendants Tassio, Avila, and Marshall move for summary judgment on Plaintiff Vera Clanton's Fourth Amendment claim, asserting qualified immunity. MSJ at 12-14. Under a qualified immunity analysis, the relevant inquiry is: "(1) whether the facts, taken in the light most favorable to the non-moving party, show that the officials' conduct violated a constitutional right, and (2) whether the law at the time of the challenged conduct clearly established that the conduct

1    was unlawful." *Felarca*, 891 F.3d at 815 (citing *Saucier v. Katz*, 533 U.S. 194, 201 (2001)).  The

2    Court will address each prong in turn.

3                              a.   Violation of a Constitutional Right

4        Plaintiff Clanton alleged two violations of her constitutional rights: (1) she was arrested

5    without probable cause and (2) the officers used excessive force in her arrest.  TAC ¶ 255-58.

6    Defendants argue that the arrest was made with probable cause and that the officers did not use

7    excessive force in effectuating her arrest.  MSJ at 12-14.  The Court will address each in turn.

8                              1.   Probable Cause

9        First, Defendants assert that they had probable cause to arrest Clanton.  "Probable cause

10   exists if the arresting officers 'had knowledge and reasonably trustworthy information of facts and

11   circumstances sufficient to lead a prudent person to believe that [the arrestee] had committed or

12   was committing a crime.'"  *Gravelet-Blondin v. Shelton*, 728 F.3d 1086, 1097-98 (9th Cir. 2013)

13   (quoting *Maxwell v. Cnty. of San Diego*, 697 F.3d 941, 951 (9th Cir. 2012)).  The Supreme Court

14   has recognized that probable cause "is not a high bar."  *Kaley v. United States*, 571 U.S. 320, 338

15   (2014).  "If an officer has probable cause to believe that an individual has committed even a very

16   minor criminal offense in his presence, he may, without violating the Fourth Amendment, arrest

17   the offender."  *Atwater v. City of Lago Vista*, 532 U.S. 318, 354 (2001).

18       Here, the officers arrested Clanton for violation of the curfew order.  She was warned

19   several times by officers that there was a curfew, and she would be arrested if she did not leave,

20   but she did not leave.  Clanton Dep. at 34-35; *see also* Huang Decl., Ex. 14 (curfew order).  When

21   she did not disperse, Tassio ordered other officers to arrest her.  Tassio Dep. 2 at 88:4-89:6.  This

22   undisputed evidence establishes that officers had probable cause to arrest Clanton.  *See* Huang

23   Decl. Ex. 14 (curfew order); Cal. Gov't Code § 36900(a) (violation of city ordinance a

24   misdemeanor).  The Court therefore determines that the act of arresting Clanton did not violate her

25   constitutional rights.  It now turns to whether the officers used excessive force in effectuating the

26   arrest.

27                              2.   Excessive force

28       Second, the officers assert that they did not use excessive force in effectuating the arrest.

                                                    24

As discussed, "police use of force violates the Fourth Amendment if it is objectively unreasonable under the circumstances." *Felarca*, 891 F.3d at 816 (citing *Graham*, 490 U.S. at 388). A court must "assess reasonableness by balancing 'the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake.'" *Id.* (quoting *Graham*, 490 U.S. at 396). Courts first consider the governmental interests at stake, such as "(1) the severity of the crime at issue, (2) whether the suspect posed an immediate threat to the safety of the officers or others, and (3) whether the suspect was actively resisting arrest or attempting to evade arrest by flight." *Torres v. City of Madera*, 648 F.3d at 1124 (citing *Graham*, 490 U.S. at 396). On the other side, courts also consider the plaintiff's interests by looking to the "type and amount of force inflicted" and "the severity of injuries" experienced by the plaintiff. *Felarca*, 891 F.3d at 817.

The Court first examines the governmental interests at stake. On the first *Graham* factor—the severity of the crime—Plaintiff was violating a curfew, but there is no evidence that she was committing any acts of violence. On the second factor—whether Plaintiff presented an immediate threat to the safety of the officers or others—the video evidence shows that Clanton was not directly threatening officer safety. But Tassio states that, although she was not violent, the fact that she refused to leave after being ordered to leave "was creating this environment where people were openly defiant towards law enforcement and refusing to the follow the curfew order violation, or refusing to follow our lawful orders." Tassio Dep. 2 at 88:13-25. And on the third factor—resisting or evading arrest—Plaintiff refused to disperse, but there is no evidence that Plaintiff resisted arrest once the officers began to arrest her. Plaintiff's interest factors—the type and amount of force used and the injuries inflicted—further weigh in favor of a finding of excessive force. Plaintiff has alleged that although she was peacefully recording police activity, the officers arrested her. The evidence shows that the police took her down to the ground in order to handcuff Clanton. Clanton has submitted evidence showing the nature of her injuries.

The Court finds there is a genuine dispute of material fact as to whether the officers used excessive force in effectuating Clanton's arrest. A reasonable jury could determine the force was excessive. The Court therefore moves to the second step of the qualified immunity analysis—

United States District Court
Northern District of California

1    whether the violation was clearly established.

2                    b.   Clearly Established

3            Defendants also assert qualified immunity.  MSJ at 14.  They argue that there is no clearly

4    established law that the officers could not use a control hold to arrest Clanton.  *Id.*  Under the

5    second step of the qualified immunity analysis, the Court must "consider whether the law was

6    clearly established at the time of the challenged conduct."  *Felarca*, 891 F.3d at 816 (citing *Sjurset

7    v. Button*, 810 F.3d 609, 615 (9th Cir. 2015)).  The Supreme Court recently reiterated the

8    longstanding principle that "the clearly established right must be defined with specificity."  *City of

9    Escondido v. Emmons*, 139 S. Ct. 500, 503 (2019).  Defining the right at too high a level of

10   generality "avoids the crucial question whether the official acted reasonably in the particular

11   circumstances that he or she faced."  *Dist. of Columbia v. Wesby*, 138 S. Ct. 577, 590

12   (2018) (quoting *Plumhoff v. Rickard*, 572 U.S. 765, 779 (2014)).  "[A] defendant cannot be said to

13   have violated a clearly established right unless the right's contours were sufficiently definite that

14   any reasonable official in the defendant's shoes would have understood that he was violating

15   it."  *Plumhoff*, 134 S. Ct. at 778-79.  There can, however, be "the rare 'obvious case,' where the

16   unlawfulness of the officer's conduct is sufficiently clear even though existing precedent does not

17   address similar circumstances."  *Vazquez v. Cnty. of Kern*, 949 F.3d 1153, 1164 (9th Cir.

18   2020) (quoting *Wesby*, 138 S. Ct. at 590).

19           The Court must determine whether it was clearly established that the officers here used

20   excessive force in arresting Clanton.  The Ninth Circuit has said that "[t]he right to be free from

21   the application of non-trivial force for engaging in mere passive resistance was clearly established

22   prior to 2008."  *Gravelet-Blondin*, 728 F.3d at 1093.  Here, the evidence establishes that Clanton

23   had observed a man getting arrested, and she walked over to witness and record the arrest.

24   Clanton Decl. ¶ 3.  She was warned by officers that there was a curfew, but she did not leave, and

25   Tassio ordered her arrest.  Clanton Dep. at 34-35; Tassio Dep. 2 at 88:4-89:6; Neumer Decl., Ex.

26   B.  The officers then arrested her.  Clanton Decl. ¶ 3.  There are several videos of the arrest from

27   officers' body worn cameras, but none provides a completely clear depiction of her arrest.  *See*

28   Neumer Decl., Exs. B, D, E, F.  Clanton's knees were injured from the arrest.  *See* Clanton Decl. ¶

United States District Court
Northern District of California

26

1    3; Marinho Decl., Ex. N; Huang Decl., Ex. 16.  Based on the evidence submitted by Clanton, a

2    reasonable jury could find that Clanton was engaged in mere passive resistance and that the force

3    used by the officers was excessive and non-trivial.

4         Defendants point the Court to *Donovan v. Phillips*, 685 F. App'x 611 (9th Cir. 2017).  That

5    case stemmed from an arrest at a traffic stop, in which the plaintiff alleged excessive force.  *Id.* at

6    612.  The plaintiff did not follow an officer's orders to stay in her vehicle while he administered a

7    sobriety test to her partner.  *Id.*  The officer arrested plaintiff using a control hold, which resulted

8    in an injury to the plaintiff's rotator cuff.  *Id.* at 614.  The Ninth Circuit upheld the district court's

9    determination that the officer did not use excessive force, and it stated that the officer was entitled

10   to qualified immunity.  *Id.* at 613.  But that case is distinguishable.  The Ninth Circuit made much

11   of the fact that the stop happened in the context of a traffic stop, stating that "[t]he Supreme Court

12   has expressly recognized that traffic stops 'are especially fraught with danger to police officers.'"

13   *Id.* at 612 (quoting *Arizona v. Johnson*, 555 U.S. 323, 330 (2009)).  The Ninth Circuit went on to

14   mention that the officer was outnumbered and "ha[d] to monitor two potentially intoxicated

15   individuals on the side of a highway at night."  *Id.* at 612-13.  Further, the court noted that the

16   officer's conduct complied with the California Highway Patrol's Highway Patrol Manual.  *Id.* at

17   613.  The arrest here happened in completely different factual circumstances.  The arrest did not

18   take place in the context of a traffic stop, and it therefore did not have the inherent dangers

19   recognized by the Supreme Court and Ninth Circuit.  The officers' conduct was not governed by

20   the California Highway Patrol's Highway Patrol Manual.  And the officers were not outnumbered

21   by Clanton; instead, they outnumbered her.

22        The Court determines that it is for a jury to determine whether the officers' conduct

23   violated Clanton's Fourth Amendment right to be free from excessive force.  It was clearly

24   established that Clanton had that right.

25                                        * * * * *

26        The Court DENIES Defendants Avila, Marshall, and Tassio's motion for summary

27   judgment as to Claim 16.

28

United States District Court
Northern District of California

### 3.  Plaintiff Derrick Sanderlin (Claim 9)

Defendants Garcia, Dwyer, and Panighetti move for summary judgment on Plaintiff Derrick Sanderlin's Fourth Amendment claim, asserting qualified immunity.  MSJ at 7-12. Sanderlin alleges that Defendant Panighetti shot him with a rubber bullet in violation of his Fourth Amendment rights, and his claims against Defendants Garcia and Dwyer are based on supervisory liability.  The Court will therefore separately analyze the claims against Defendant Panighetti and Defendants Dwyer and Garcia.

#### a.  Defendant Panighetti

Panighetti asserts qualified immunity on Derrick Sanderlin's excessive force claim.  MSJ at 8-12.  The Court must address both prongs of the qualified immunity analysis: (1) whether Panighetti's conduct violated a constitutional right and (2) whether the law clearly established that the conduct was unlawful.  *See Felarca*, 891 F.3d at 815.

##### 1.  Violation of a Constitutional Right

Defendants argue that Sanderlin was not unreasonably seized under the Fourth Amendment.  MSJ at 8-10.  Defendants argue that there was no seizure because Panighetti sought to move Plaintiff, not to restrain him.  *Id.*; Reply at 6.  But the Court looks at "whether the challenged conduct *objectively* manifests an intent to restrain, for [a court] rarely probe[s] the subjective motivations of police officers in the Fourth Amendment context."  *Torres*, 141 S. Ct. at 998 (emphasis in original).  In *Nelson*, the Ninth Circuit rejected the defendant officers' argument that there was no seizure because their intent was to disperse the crowd, because the subjective intent of the officers is not determinative of whether there was a seizure.  685 F.3d at 877.  Here, Panighetti intentionally aimed and fired at Derrick Sanderlin.  Derrick Sanderlin has at least created a dispute of fact as to whether there was a seizure for purposes of the Fourth Amendment.

Now that the Court has determined there is a dispute of fact as to whether there was a seizure, it turns to the question of whether Panighetti used excessive force in shooting Derrick Sanderlin with a projectile.  "Under the first step of the [qualified immunity] analysis, police use of force violates the Fourth Amendment if it is objectively unreasonable under the circumstances." *Felarca*, 891 F.3d at 816 (citing *Graham*, 490 U.S. at 388).  As discussed, a court must "assess

United States District Court
Northern District of California

reasonableness by balancing 'the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake.'" *Id.* (quoting *Graham*, 490 U.S. at 396). Courts first consider the governmental interests at stake, such as "(1) the severity of the crime at issue, (2) whether the suspect posed an immediate threat to the safety of the officers or others, and (3) whether the suspect was actively resisting arrest or attempting to evade arrest by flight." *Torres v. City of Madera*, 648 F.3d at 1124 (citing *Graham*, 490 U.S. at 396). On the other side, courts also consider the plaintiff's interests by looking to the "type and amount of force inflicted" and "the severity of injuries" experienced by the plaintiff. *Felarca*, 891 F.3d at 817.

The Court first examines the governmental interests at stake. On the first *Graham* factor—the severity of the crime—Plaintiff was protesting peacefully. He had his hands up, and he was holding a sign. On the second factor—whether Plaintiff presented an immediate threat to the safety of the officers or others—Plaintiff states he was not directly threatening officer safety. However, Panighetti states that Plaintiff was standing between officers and two individuals who the officers considered dangerous targets, thus preventing the officers from getting to those targets. Sanderlin claims he was merely standing with his hands up. And on the third factor—resisting or evading arrest—there is no evidence that Plaintiff was charged with any crime or that any officer attempted to arrest him. Plaintiff's interest factors—the type and amount of force used and the injuries inflicted—further weigh in favor of a finding of excessive force. The force used against Plaintiff was quite strong—a projectile weapon. And the injuries inflicted were incredibly severe.

The Court finds there is a genuine dispute of material fact as to whether Panighetti used excessive force against Derrick Sanderlin. It would depend largely on how the jury interprets the video footage, and whether the jury credits Panighetti's testimony that Sanderlin was blocking the police from targeting the two individuals behind the dumpster. Because the Courts determines there is a dispute of fact, it moves to the second step of the qualified immunity analysis—whether the violation was clearly established.

2. Clearly Established

United States District Court
Northern District of California

1   Under the second step of the qualified immunity analysis, the Court must "consider

2   whether the law was clearly established at the time of the challenged conduct." *Felarca*, 891 F.3d

3   at 816 (citing *Sjurset*, 810 F.3d at 615).  And "the clearly established right must be defined with

4   specificity." *Emmons*, 139 S. Ct. at 503.

5   Here, the Court finds that granting qualified immunity to Officer Panighetti turns on

6   accepting Defendants' version of disputed facts, so qualified immunity is not appropriate at

7   present.  *See Estate of Aguirre*, 29 F.4th at 630; *Espinosa*, 598 F.3d at 532.

8   Here, looking at the facts in the light most favorable to the Plaintiff, the question is

9   whether it was clearly established that an officer could not shoot a projectile at an individual who

10   was peacefully protesting.  The Court again looks to *Nelson*, summarized above.

11   As in *Nelson*, here, Panighetti shot a projectile at Derrick Sanderlin after shouting dispersal

12   orders that Mr. Sanderlin stated he did not hear, even though Mr. Sanderlin was not engaged in

13   any violence towards the police, although others around him were.  Under Sanderlin's version of

14   events, Panighetti had notice that his shooting of Sanderlin would be unconstitutional.  The Court

15   therefore denies Panighetti's request for qualified immunity.

16                          b.   Defendants Garcia and Dwyer

17   Defendants Garcia and Dwyer also move for summary judgment on Plaintiff Derrick

18   Sanderlin's Fourth Amendment excessive force claim.  MSJ at 15-18.  For the reasons discussed

19   above with respect to the Group Plaintiffs, the Court determines that Garcia was not liable for any

20   deprivation of Derrick Sanderlin's constitutional rights, but Dwyer may be.

21                                * * * * *

22   The Court DENIES Defendants Panighetti and Dwyer's motion for summary judgment as

23   to Claim 9 and GRANTS Defendant Garcia's motion for summary judgment as to Claim 9.

24        **D.   First Amendment Claims (Claims 1-6, 8)**

25   Defendants also move for summary judgment on Plaintiffs' Section 1983 claims asserting

26   violations of the First Amendment (Claims 1-6, 8).  To state a claim for retaliatory violation of the

27   First Amendment, Plaintiffs must plead and prove (1) they were engaged in a constitutionally

28   protected activity; (2) Defendants' actions would "chill a person of ordinary firmness from

continuing to engage in the protected activity;" and (3) "the protected activity was a substantial or motivating factor in [Defendants'] conduct." *Index Newspapers LLC v. U.S. Marshals Serv.*, 977 F.3d 817, 827 (9th Cir. 2020). The final element can be demonstrated "through direct or circumstantial evidence" and "involves questions of fact that normally should be left for trial." *NAACP of San Jose/Silicon Valley v. City of San Jose*, 562 F. Supp. 3d 382, 398 (N.D. Cal. 2021) (citing *Index Newspapers*, 977 F.3d at 827).

### 1. Plaintiffs Cayla Sanderlin, Breanna Contreras, Pietro di Donato, Adira Sharkey, and Joseph Stukes (Claims 2-6)

Plaintiffs Cayla Sanderlin, Breanna Contreras, Pietro di Donato, and Adira Sharkey bring their Section 1983 claims asserting violations of the First Amendment against Defendants Garcia and Dwyer, *see* TAC ¶¶ 171-94, and Plaintiff Joseph Stukes brings his against Defendant Garcia, *see* TAC ¶¶ 195-200 (Claims 2-6). Defendants Garcia and Dwyer move for summary judgment on qualified immunity grounds. MSJ at 15-18.

Defendants here dispute the third prong: whether Plaintiffs' protected activity—protesting—was a substantial or motivating factor in the officers' conduct. MSJ at 16. Plaintiffs argue that the fact that the protests were anti-police in nature is sufficient circumstantial evidence that the protest was a substantial or motivating factor in the conduct. Opp. at 16-17. They point to several other cases dealing with police brutality protests in spring 2020, in which courts made such an inference. *Id.* But those cases were decided on a motion to dismiss or motion for preliminary injunction or temporary restraining order, not a motion for summary judgment. *See Sanderlin II*, 2022 WL 913055, at *7-8; *NAACP of San Jose/Silicon Valley*, 562 F. Supp. 3d at 398-400; *Anti Police-Terror Project v. City of Oakland*, 477 F. Supp. 3d 1066, 1088 (N.D. Cal. 2020); *Don't Shoot Portland v. City of Portland*, 465 F. Supp. 3d 1150, 1155-56 (D. Or. 2020); *Black Lives Matter Seattle-King Cnty. v. City of Seattle*, 466 F. Supp. 3d 1206, 1214 (W.D. Wash. 2020); *Baca v. Anderson*, No. 22-cv-02461-WHO, 2022 WL 7094267, at *4 (N.D. Cal. Oct. 12, 2022).

That being said, the Court notes that it would be difficult for Plaintiffs to produce direct evidence that the officers' subjective motives for shooting were related to the protests and their

subject matters.  And Plaintiffs have produced some evidence.  Captain Dwyer stated in his deposition that the protests were "straight anti-police."  Dwyer Dep. at 69:3-25.  Further, the Ninth Circuit has recognized that a short "proximity in time between the protected action and the allegedly retaliatory [conduct]" supports a First Amendment claim.  *Keyser v. Sacramento City Unified Sch. Dist.*, 265 F.3d 741, 744 (9th Cir. 2001).  Here, the retaliatory actions happened during the protests.  Further, the Court can consider reasonable inferences drawn from the evidence that there was no reason for the officers to have engaged in the retaliatory actions towards Plaintiffs *other than* the speech; there is no evidence that the Group Plaintiffs were breaking the law.  *Cf. Duran v. City of Douglas, Ariz.*, 904 F.2d 1372, 1377 (9th Cir. 1990) (denying summary judgment to officer on First Amendment claim where record showed no "legitimate, articulate reason" for officer to have arrested plaintiff).  The Court also notes that the Ninth Circuit has recognized that a First Amendment analysis "involves questions of fact that normally should be left for trial."  *Index Newspapers*, 977 F.3d at 827.  The Court thus finds that there is a genuine dispute of material fact as to whether the Group Plaintiffs' protected activity— anti-police protesting—was a "substantial or motivating factor" in the officers' conduct.

Group Plaintiffs again brought these claims against Defendants Garcia and Dwyer.  While it is not entirely clear on what theory Group Plaintiffs name these Defendants, it appears to be under a theory of supervisory liability.  And for supervisory liability, Group Plaintiffs must show Garcia and/or Dwyer's "(1) . . . personal involvement in the constitutional deprivation, or (2) a sufficient causal connection between the supervisor's wrongful conduct and the constitutional violation."  *Starr*, 652 F.3d at 1207 (quoting *Hansen*, 885 F.2d at 646).

First, as above, Plaintiffs provide no evidence that either Garcia or Dwyer was personally involved in the incidents in which they were impacted by projectiles or tear gas.  Second, the Court looks at a causal connection.  And again, as above, the Court determines Plaintiffs have not shown a causal connection as to Garcia.  He authorized the use of tear gas as necessary, which did not set in motion a series of events that caused the alleged First Amendment violations.  But again, as above, the Court determines there are disputed facts as to Dwyer's role.  A reasonable jury could determine that Dwyer improperly called the protest an unlawful assembly and authorized the

use of less-lethal weapons despite knowing that many protestors were peaceful, and that this set in motion the series of events that he knew or reasonably should have known would lead to Group Plaintiffs' alleged First Amendment violations.  And, for the same reasons and based on the same evidence that the Court pointed to above in its discussion of the third prong—retaliatory motive— the Court determines that a reasonable jury could also find that Dwyer acted with a retaliatory motive.

Dwyer also argues that he did not violate a clearly established right.  *See* MSJ at 15.  Here, looking at the facts in the light most favorable to the Plaintiffs, the question is whether Plaintiffs had a clearly established right to peacefully engage in anti-police protests.  And the Court finds that such a right was clearly established.  "Police officers have been on notice at least since 1990 that it is unlawful to use their authority to retaliate against individuals for their protected speech." *Ford v. City of Yakima*, 706 F.3d 1188, 1195 (9th Cir. 2013), *abrogated on other grounds by Nieves v. Bartlett*, 139 S. Ct. 1715 (2019); *see also City of Houston v. Hill*, 482 U.S. 451, 461 (1987) ("[T]he First Amendment protects a significant amount of verbal criticism and challenge directed at police officers"); *Collins v. Jordan*, 110 F.3d 1363, 1371 (9th Cir. 1996) ("Activities such as demonstrations, protest marches, and picketing are clearly protected by the First Amendment.").  Dwyer is thus not entitled to qualified immunity on this claim.

The Court GRANTS Defendant Garcia's motion for summary judgment as to Claims 2-6. The Court DENIES Defendant Dwyer's motion for summary judgment as to Claims 2-5.

### 2.  Plaintiff Vera Clanton (Claim 8)

Defendant Garcia also moves for summary judgment as to Plaintiff Vera Clanton's First Amendment claim against him.  Defendants argue that Clanton cannot show retaliatory motive because she was arrested for violating the curfew, not for her protected activity.  MSJ at 14-15. The Court agrees with regard to the fact of Clanton's arrest.  As discussed above, the officers had probable cause to arrest Clanton, as she was in violation of the curfew.  *See* Clanton Dep. at 34-35; Tassio Dep. 2 at 88:4-89:6; Huang Decl., Ex. 14 (curfew order).  Further, Clanton has provided no evidence that Chief Garcia would be a proper Defendant for this claim.  He was neither personally involved in her arrest, nor was there a causal connection between his actions authorizing the use of

33

tear gas and her arrest.  Plaintiffs submit no other evidence of Chief Garcia's connection to Clanton's arrest.

The Court therefore GRANTS Defendant Garcia's motion for summary judgment as to Claim 8.

### 3.  Plaintiff Derrick Sanderlin (Claim 1)

Defendants Panighetti, Garcia, and Dwyer move for summary judgment on Derrick Sanderlin's First Amendment claim against them.  MSJ at 14-18.  The Court will analyze whether Derrick Sanderlin has a claim as to Panighetti.  Panighetti disputes the third prong: the motivation for the officer's conduct.  *See* MSJ at 15.  The Court will then address Garcia and Dwyer.  Finally, the Court will address Defendants' claims of qualified immunity.  *See id.* at 14-15.

Here, Panighetti states that his motivation for shooting Derrick Sanderlin was not Sanderlin's protected activity, but rather the fact that Sanderlin was blocking Panighetti and other officers from taking action against the suspects standing behind the dumpster.  MSJ at 15; *see* Panighetti Dep. at 37:15-18, 79:23-81:3.  But Derrick Sanderlin states that he was merely standing in front of Panighetti with his hands up.  As stated above with respect to the Fourth Amendment claim, there is a dispute of fact as to Derrick Sanderlin's actions prior to the shooting.  It is for the jury to decide.  And if the jury credits Sanderlin's version of the facts, then it could determine, based on the circumstantial evidence discussed with regard to Group Plaintiffs, above, that Panighetti's shooting of Sanderlin was in retaliation for Plaintiff's protected protesting activity.

For the same reasons as discussed above with respect to Group Plaintiffs, the Court determines that Garcia is not liable as a supervisor for any violation of Derrick Sanderlin's First Amendment rights, but there is a dispute of fact as to whether Dwyer is liable.

The Court next turns to the qualified immunity analysis.  Again, the Court finds that granting qualified immunity turns on accepting Defendants' version of disputed facts, so qualified immunity is not appropriate.  *See Estate of Aguirre*, 29 F.4th at 630; *Espinosa*, 598 F.3d at 532.  Here, looking at the facts in the light most favorable to the Plaintiff, the question is whether it was clearly established that an officer could not shoot a projectile at an individual who was peacefully protesting the police.  And the Court finds that it was clearly established.  *See Ford*, 706 F.3d at

United States District Court
Northern District of California

1195 ("Police officers have been on notice at least since 1990 that it is unlawful to use their

authority to retaliate against individuals for their protected speech."); *Hill*, 482 U.S. at 461 ("[T]he

First Amendment protects a significant amount of verbal criticism and challenge directed at police

officers"); *Collins*, 110 F.3d at 1371 ("Activities such as demonstrations, protest marches, and

picketing are clearly protected by the First Amendment.").  Defendants are thus not entitled to

qualified immunity on this claim.

The Court DENIES Defendants Panighetti and Dwyer's motion for summary judgment as

to Claim 1 and GRANTS Defendant Garcia's motion for summary judgment as to Claim 1.

### E.   Loss of Consortium (Claim 36)

Defendants City and Panighetti move for summary judgment on Plaintiff Cayla Sanderlin's

loss of consortium claim.  MSJ at 24.  "'Consortium' refers to 'the noneconomic aspects of the

marriage relation, including conjugal society, comfort, affection, and companionship.'"  *Mealy v.

B-Mobile, Inc.*, 195 Cal. App. 4th 1218, 1223 (2011) (quoting *Boeken v. Philip Morris USA, Inc.*,

48 Cal. 4th 788, 793 n.1 (2010)).  "Consortium also encompasses sexual relations, moral support,

and household services."  *Id.*  "A person who suffers  a loss of consortium as the result of a

negligent or intentional injury to his or her spouse is entitled to recover damages from the

tortfeasor."  *Id.*  In California, a claim for loss of consortium has four elements:

> (1) a valid and lawful marriage between the plaintiff and the person
> injured at the time of the injury;
> (2) a tortious injury to the plaintiff's spouse;
> (3) loss of consortium suffered by the plaintiff; and
> (4) the loss was proximately caused by the defendant's act.

*Hahn v. Mirda*, 147 Cal. App. 4th 740, 746 n.2 (2007).

Defendants argue that the cause of action should fail because Derrick Sanderlin has no

cause of action in tort.  MSJ at 24.  In response, Plaintiff merely argues that for her "loss of

consortium claim she need not prove intent, negligence is enough."  Opp. at 10.  She cites

*Rodriguez v. Bethlehem Steel Corp.*, in which the court held that "[i]n California each spouse has a

cause of action of loss of consortium, as defined herein, caused by a negligent or intentional injury

to the other spouse by a third party."  12 Cal. 3d 382, 408 (1974).  In reply, Defendants argue that

Cayla Sanderlin did not provide evidence that Panighetti acted negligently.  Reply at 15.

It is not clear whether Defendants are arguing that Cayla Sanderlin's loss of consortium claim fails because Derrick Sanderlin's Section 1983 excessive force claim should fail or because Derrick Sanderlin's intentional infliction of emotional distress claim, which his only common law tort cause of action, should fail.  The Court denied summary judgment on Mr. Sanderlin's Section 1983 excessive force claim so, to the extent Defendants make the first argument, it fails.  To the extent Defendants are arguing that the loss of consortium claim fails because Mr. Sanderlin no longer has a common law tort cause of action, that argument also fails.  Several courts have determined that the facts underlying a Section 1983 excessive force claim are sufficient to state a common law negligence claim.  *See, e.g.*, *Atkinson v. Cnty. of Tulare*, 790 F. Supp. 2d 1188, 1211 (E.D. Cal. 2011) ("Plaintiffs' claim for negligence and battery flow from the same facts as the alleged Fourth Amendment violation for excessive force and are measured by the same reasonableness standard of the Fourth Amendment."); *Gomez v. City of Fremont*, 730 F. Supp. 2d 1056, 1068 (N.D. Cal. 2010) ("Because Defendants are not entitled to summary judgment on their excessive force claim under section 1983, they are not entitled to summary judgment on the related state claims [including assault, battery, and negligence].").  Derrick Sanderlin was not required to plead a negligence claim for Cayla Sanderlin's loss of consortium claim to survive.  Because Derrick Sanderlin has shown a dispute of fact as to whether he suffered a tortious injury, Defendants have not shown they are entitled to summary judgment on Cayla Sanderlin's loss of consortium claim.

The Court therefore DENIES Defendants City and Panighetti's motion for summary judgment as to Claim 36.

### F.   Bane Act Claims (Claims 20-25, 27)

Defendants move for summary judgment as to all of Plaintiff's Bane Act claims.  MSJ at 22-23.  Under the Bane Act, a plaintiff can seek damages "if a person or persons, whether or not acting under color of law, interferes by threat, intimidation, or coercion, or attempts to interfere by threat, intimidation, or coercion, with the exercise or enjoyment by any individual or individuals of rights secured by the Constitution or laws of the United States, or of the rights secured by the Constitution or laws of this state."  Cal. Civ. Code § 52.1(b)-(c).  "The essence of a Bane Act

claim is that the defendant, by the specified improper means (i.e., 'threats, intimidation or coercion'), tried to or did prevent the plaintiff from doing something he or she had the right to do under the law or to force the plaintiff to do something that he or she was not required to do under the law." *Simmons v. Superior Court*, 7 Cal. App. 5th 1113, 1125 (2016) (quoting *Austin B. v. Escondido Union Sch. Dist.*, 149 Cal. App. 4th 860, 883 (2007)).

The Court first addresses the Group Plaintiffs, who bring their Bane Act claims against the City. *See* TAC ¶¶ 286-305. Defendants argue that the Bane Act claims fail for Group Plaintiffs because they cannot identify any officers and cannot show any specific intent to violate their constitutional rights. MSJ at 22-23. The Court first notes that municipalities can be liable for Bane Act violations by their employees under the doctrine of respondeat superior. *Robinson v. Solano Cnty.*, 278 F.3d 1007, 1016 (9th Cir. 2002) ("California . . . has rejected the *Monell* rule and imposes liability on [municipalities] under the doctrine of *respondeat superior* for acts of [municipal] employees."). Therefore, the City is a proper defendant. But the Bane Act requires that a plaintiff show "threats, intimidation or coercion separate from the coercion inherent in the . . . seizure itself." *Sandoval v. Cnty. of Sonoma*, No. 11-cv-05817-TEH, 2016 WL 612905, at *3 (N.D. Cal. Feb. 16, 2016); *see also Lyall v. City of Los Angeles*, 807 F.3d 1178, 1196 (9th Cir. 2015) ("Numerous California decisions make clear that a plaintiff in a search-and-seizure case must allege threats or coercion beyond the coercion inherent in a detention or search in order to recover under the Bane Act."). "[T]he requirements of the Bane Act cannot be satisfied simply by alleging that an individual's rights were interfered with and that the interference itself was inherently coercive." *Ranero v. Cnty. of San Bernadino*, No. CV 16-02655 CBM, 2018 WL 8058373, at *5 (N.D. Cal. Mar. 12, 2018). "[W]here coercion is inherent in the constitutional violation alleged . . . the statutory requirement of 'threats, intimidation, or coercion' is not met." *Shoyoye v. Cnty. of Los Angeles*, 203 Cal. App. 4th 947, 959 (2012). "The statute requires a showing of coercion independent from the coercion inherent in the [constitutional violation] itself." *Id.*

Here, the Group Plaintiffs have not provided evidence of any "threats, intimidation, or coercion" outside of the alleged constitutional violations themselves. The Court therefore

37

1    determines that none of the Group Plaintiffs has shown a dispute of material fact as to their Bane

2    Act claims.

3         Defendants raise similar arguments regarding Derrick Sanderlin and Vera Clanton.  MSJ at

4    22-23.  And the Court reaches the same conclusion as to them.  These Plaintiffs have not provided

5    any evidence of "threats, intimidation, or coercion" beyond the claimed excessive force used in

6    their seizures.  The Court notes that excessive force used in an unlawful arrest can support a Bane

7    Act claim.  *See Bender v. Cnty. of Los Angeles*, 217 Cal. App. 4th 968, 978 (2013) ("Where, as

8    here, an arrest is unlawful *and* excessive force is applied in making the arrest, there has been

9    coercion independent from the coercion inherent in the wrongful detention itself—a violation of

10   the Bane Act." (citation omitted) (emphasis in original)).  But because the Court determined that

11   the officers had probable cause to arrest Vera Clanton, her arrest was not unlawful, and the

12   excessive force is not sufficient for a Bane Act claim.

13        The Court GRANTS Defendant City's motion for summary judgment on the Bane Act

14   claims of the Group Plaintiffs (Claims 21-25).  The Court GRANTS Defendants City, Tassio,

15   Avila, and Marshall's motion for summary judgment on Clanton's Bane Act claim (Claim 27).

16   And the Court GRANTS Defendants City and Panighetti's motion for summary judgment on

17   Derrick Sanderlin's Bane Act claim (Claim 20).

18        **G.    *Monell***

19        Defendant City seeks summary judgment as to all three of Plaintiffs' *Monell* claims

20   (Claims 17–19).  MSJ at 18-22.  Plaintiffs, as a group, bring *Monell* claims against the City of San

21   Jose for violations of their First Amendment rights and Fourth Amendment right to be free from

22   unreasonable seizure and excessive force, and Plaintiff Clanton brings a separate *Monell* claim for

23   violation of her Fourth Amendment right to be free from arrest without probable cause.  TAC ¶¶

24   259-81.  Plaintiffs assert that their allegations support *Monell* liability pursuant to unconstitutional

25   customs or policies, failure to train, and ratification.  Opp. at 19.

26        "The Supreme Court in *Monell* held that municipalities may only be held liable under

27   section 1983 for constitutional violations resulting from official . . . policy or custom."  *Benavidez*

28   *v. Cnty. of San Diego*, 993 F.3d 1134, 1153 (9th Cir. 2021) (citing *Monell v. Dep't of Soc. Servs.*

United States District Court
Northern District of California

United States District Court
Northern District of California

*of City of New York*, 436 U.S. 658, 694 (1978)).  "[P]olicies can include written policies, unwritten customs and practices, failure to train municipal employees on avoiding certain obvious constitutional violations, . . . and, in rare instances, single constitutional violations [that] are so inconsistent with constitutional rights that even such a single instance indicates at least deliberate indifference of the municipality[.]"  *Id.* at 1153 (citations omitted).  "A municipality may [also] be held liable for a constitutional violation if a final policymaker ratifies a subordinate's actions." *Lytle v. Carl*, 382 F.3d 978, 987 (9th Cir. 2004).  "In order to establish liability for governmental entities under *Monell*, a plaintiff must prove '(1) that [the plaintiff] possessed a constitutional right of which [s]he was deprived; (2) that the municipality had a policy; (3) that this policy amounts to deliberate indifference to the plaintiff's constitutional right; and (4) that the policy is the moving force behind the constitutional violation.'"  *Dougherty v. City of Covina*, 654 F.3d 892, 900 (9th Cir. 2011) (alterations in original) (quoting *Plumeau v. Sch. Dist. No. 40 Cnty. of Yamhill*, 130 F.3d 432, 438 (9th Cir. 1997)).  The Court will first address Plaintiff Clanton's standalone claim for *Monell* liability, and it will then analyze each theory of *Monell* liability for the group claims in turn.

### 1. Plaintiff Clanton's *Monell* Claim (Claim 19)

Defendants move for summary judgment as to Plaintiff Vera Clanton's standalone claim against the City asserting *Monell* liability for her arrest without probable cause.  *See* TAC ¶¶ 271-81.  A *Monell* claim requires that the Plaintiff have been deprived of a constitutional right.  *See Dougherty*, 654 F.3d at 900.  The Court earlier determined that the undisputed evidence demonstrated the officers had probable cause to arrest Clanton.  She therefore cannot prevail on a *Monell* claim against the City for violation of her Fourth Amendment right to not be arrested without probable cause.  The Court GRANTS the City's motion for summary judgment as to Clanton's *Monell* claim against the City (Claim 19).

### 2. Group Claims (Claims 17-18)

Defendants also move for summary judgment as to all Plaintiffs' *Monell* claims against the City for violation of their First and Fourth Amendment rights.  *See* TAC ¶¶ 259-70.  Because several Plaintiffs have shown a dispute of fact as to whether they were deprived on their Fourth

1    Amendment right to be free from excessive force and their First Amendment rights, these claims

2    can move forward.  The Court will address each theory of liability in turn.

3                    a.   Policy, Custom, or Practice

4           A municipality may be held liable on the basis of an unconstitutional policy if a plaintiff

5    can "prove the existence of a widespread practice that, although not authorized by written law or

6    express municipal policy, is 'so permanent and well settled as to constitute a "custom or usage"

7    with the force of law.'"  *City of St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988) (quoting *Adickes

8    v. S.H. Kress & Co.*, 398 U.S. 144, 167-168 (1970)).  "Liability for improper custom may not be

9    predicated on isolated or sporadic incidents"—rather, "[t]he custom must be so persistent and

10   widespread that it constitutes a permanent and well settled city policy."  *Trevino v. Gates*,

11   99 F.3d 911, 918 (9th Cir. 1996) (internal quotation marks and citations omitted).

12          One policy that Plaintiffs point to in the briefing as being a constitutional violation is the

13   use of skip-fired, or multi-target, munitions.  Opp. at 20-21.  The 37mm weapon is the one that

14   fires multi-round munitions.  *See* AAR at 104; Tassio Dep. 1 at 35:6-11.  This theory faces several

15   problems.  First, for *Monell* liability, a plaintiff must show "that the policy is the moving force

16   behind the constitutional violation."  *Dougherty*, 654 F.3d at 900 (quoting *Plumeau*, 130 F.3d at

17   438).  Here, none of the Plaintiffs has provided any evidence of being struck with a projectile that

18   was fired as a skip-fired munition.  And second, "an isolated or sporadic incident . . . cannot form

19   the basis of *Monell* liability for an improper custom."  *Saved Mag. v. Spokane Police Dep't*, 19

20   F.4th 1193, 1201 (9th Cir. 2021) (citing *Trevino*, 99 F.3d at 918) (cleaned up).  Tassio stated in his

21   deposition that the 37mm launchers were only deployed on May 29, 2020.  Tassio Dep. 1 at

22   36:21-22.  Plaintiffs have not provided any examples of use of skip-fired munitions on protestors

23   that preceded the George Floyd protests.  Plaintiffs thus have not offered any evidence that the

24   policies or customs were "so persistent and widespread that [they] constitute[] a permanent and

25   well settled city policy."  *Trevino*, 99 F.3d at 918.

26          In their opposition, Plaintiffs also asserted that "Garcia changed SJPD policies days before

27   the May 29, 2020 demonstration to allow use of additional chemical agent devices and allow use

28   of impact munitions that it had previously prohibited in crowd control situations."  Opp. at 18-19.

United States District Court
Northern District of California

40

But the citation that Plaintiffs provide for that assertion discusses a change in policy made *after* the protests had already started—on June 1, 2020.  *See* Exp. Rpt. ¶ 59.  Only one Plaintiff— Stukes—states that he was at the protests after June 1, 2020; he attended on June 2, 2020.  Stukes Decl. ¶ 3.  The June 1, 2020 memorandum provided that "only the 37mm Projectile Impact Weapon (i.e. SAGE Gun) may be used for crowd control purposes in the method prescribed in this section.  40mm Projectile Impact Weapons that contain chemical agents may be used for crowd control purposes as described in section L2609 [of the *Duty Manual*]."  Exp. Rpt. ¶ 59.  It further provided that the 37mm launcher "is not intended to target individual suspects, but to provide a visual and auditory deterrent (loud report and bright muzzle flash).  The primary objective when deploying a 37mm Projectile Impact Weapon in this manner is to compel persons engaged in assaultive resistance to disperse peacefully, so that the use of physical force intentionally directed at persons can be avoided."  *Id.* ¶ 60.  Stukes states that officers fired at him with their less-lethal weapons.  Stukes Decl. ¶ 5.  He does not know which officer(s) shot the projectiles that hit him, noting that there were several officers in the vicinity.  Stukes Dep. at 28:15-22, 50:8-10.  Stukes was struck from the back on his left hip with a 40mm foam baton, and his right leg.  Stukes Decl. ¶ 5.  Plaintiffs have provided no evidence suggesting that the June 1, 2020 policy change was the "moving force" behind any deprivation of Stukes's constitutional rights, or the constitutional rights of any other Plaintiff.

Plaintiffs also mention that "SJPD wrongly declared the protest an unlawful assembly through a loudspeaker but the announcement was inaudible and/or unclear."  Opp. at 21.  But Plaintiffs provide no argument or evidence as to why it was improper for SJPD to declare the protest an unlawful assembly.  To the extent Plaintiffs were seeking to make this argument, the Court determines it has been waived.

Plaintiffs' policy or custom *Monell* theory thus fails.

### b. Failure to Train

"A municipality's failure to train an employee who has caused a constitutional violation can be the basis for § 1983 liability where the failure to train amounts to deliberate indifference to the rights of persons with whom the employee comes into contact."  *Long v. Cnty. of Los Angeles*,

442 F.3d 1178, 1186 (9th Cir. 2006) (citing *City of Canton v. Harris*, 489 U.S. 378, 388 (1989)). This standard is met when "the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need." *Canton*, 489 U.S. at 390. "Only where a failure to train reflects a 'deliberate' or 'conscious' choice by a municipality—a 'policy' as defined by our prior cases—can a city be liable for such a failure under § 1983." *Id.* at 389. And only under such circumstances does the failure to train constitute "a policy for which the city is responsible, and for which the city may be held liable if it actually causes injury." *Id.* at 390. "A municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train." *Connick v. Thompson*, 563 U.S. 51, 61 (2011). As such, "[a] pattern of similar constitutional violations by untrained employees is 'ordinarily necessary' to demonstrate deliberate indifference for purposes of failure to train." *Id.* at 62.

Here, Plaintiffs assert a failure to train related to violation of their First Amendment rights and Fourth Amendment right to be free from unreasonable seizure and excessive force. The Court must therefore evaluate whether the training on both subjects was adequate.

Every SJPD officer must graduate from a police academy that is certified by the California Commission on Peace Officer Standards and Training ("POST"). Declaration of Christopher Sciba, ECF No. 103 ("Sciba Decl.") ¶ 4. Officers receive a Basic Certificate after completing the initial academy, which is a 26-week program with about 976 hours of training, and they must complete Continuing Professional Training every two years. *Id.* ¶¶ 4, 6. Police academies can become certified by POST if they teach the POST minimum standards, which include Learning Domains ("LDs"). *Id.* ¶ 5. The SJPD police academy teaches the 43 POST LDs, as well as additional training, including a four-hour course on PIWs. *Id.* ¶ 6. POST has LDs on arrest and control and use of force, which teach about reasonable force. *Id.* ¶¶ 7-8. The additional SJPD course on PIWs addresses the *Graham v. Connor* factors. *Id.* ¶ 9.

The CPT courses address use of force and less-lethal weapons, among other issue areas. Sciba Decl. ¶ 10. In 2018, SJPD emailed a training video to all officers, which they also played during briefings, following a change to the *Duty Manual* that requires all trained patrol officers to

United States District Court
Northern District of California

carry a stunbag shotgun or 40mm PIW while on duty.  *Id.* ¶ 11.  It warns that projectiles fired from either weapon can cause serious injury or death; provides instructions for using the weapons; and reminds officers of the *Duty Manual* language on these weapons.  *Id.*  There is also a CPT course on Defensive Tactics Update that is given every two years, including in 2019, which addresses the use of less-lethal projectile weapons.  *Id.* ¶ 12; Huang Decl., Ex. 12 ("Sciba Dep.") at 22:15-23:22.  It includes a lecture-based portion and a practical exercise portion.  Sciba Dep. at 27:15-28:15.  It provides, among other things, that officers should avoid targeting or striking the groin area.  Sciba Decl. ¶ 12.  Another CPT course called Force Options Simulator, which was given in 2017, also addresses the reasonable officer standard and the *Graham* factors.  *Id.* ¶ 13.

Plaintiff provided a copy of the PowerPoint presentation used by Officer Sciba in his training on Projectile Impact Weapons.  *See* Marinho Supp. Decl., Ex. LL (ECF No. 116-4) ("PPT").  The presentation includes information on the *Graham* factors.  *Id.* at 6.  It also covers less-lethal weapons, including both 37mm and 40mm launchers.  *Id.* at 8, 17-19.  It addresses where officers should aim their shots and includes three different zones, from least to greatest severity of injury.  *Id.* at 35-40.  The description of Zone 1 states that "[t]he groin area should not be intentionally targeted," but the slides also include a cartoon in which cavemen have shot a large animal in the groin with a bow and arrow that states "Maybe we should write that spot down."  *Id.* at 38, 41.  The abdominal area is in Zone 2.  *Id.* at 39.  The slides state that Zone 3 "carries the greatest potential for serious or fatal injury and should be avoided when possible."  *Id.* at 40.  The final slide of the presentation states "Do not hesitate[.] Always win[.]"  *Id.* at 47.

Officer Panighetti completed the Defensive Tactics Update course on May 10, 2019; Officer Marshall completed the Force Options Simulator course on May 9, 2017; and Officer Avila completed the Force Options Simulator course on June 15, 2017.  Sciba Decl. ¶ 14.  Panighetti stated that he underwent a specific less-lethal projectile weapons training prior to being allowed to carry the 40mm launcher.  Declaration of Michael Panighetti, ECF No. 104 ("Panighetti Decl.") ¶ 4.  He states he was taught not to aim for the groin, but that he could aim for the lower abdomen.  *Id.* ¶ 5.  He also states that he had training on the SJPD *Duty Manual* sections addressing less-lethal PIWs, and he believed he could use the weapon in two circumstances:

"when objectively reasonable (1) to incapacitate a suspect armed with a weapon likely to cause serious bodily injury or death until the suspect can be controlled and safely taken into custody, or (2) in situations where its use is likely to prevent any person from being seriously injured." *Id.* ¶ 7.

Tassio provided a four-hour training on use of the 37mm launcher for officers who had already completed the SJPD less-lethal weapons training.  Tassio Dep. 1 at 38:10-39:21.  That course "involved power point and practical exercises and firing the weapon in a live environment." *Id.* at 38:22-24.  Tassio stated that shortly after the protests, the SJPD changed policy regarding the 37mm weapon such that it could no longer be deployed.  *Id.* at 44:10-46:9. He also stated that use of the weapon for crowd dispersal is no longer allowed under California law.  *Id.* at 44:10-16.

SJPD also provides training on First Amendment issues.  One of the POST LDs covers crowd control training.  Declaration of Lee Tassio, ECF No. 105 ("Tassio Decl.") ¶ 4.  This training teaches officers about their responsibility to protect individuals' First Amendment rights to free speech and assembly; addresses legal observers and their role; and also covers news media and the taping or photographing of officers.  *Id.* ¶ 5.  The training also addresses dispersal orders and what constitutes an unlawful assembly.  *Id.* ¶ 6.  There is an 8-hour crowd control training for certain units that covers the First Amendment, legal observers, arrest techniques, the use of PIWs, and crowd control tactics, which Marshall and Avila attended in April 2020.  *Id.* ¶¶ 7-8.  Portions of the *Duty Manual* also address these issues, stating that officers cannot interfere with members of the public and media who take audio or video recordings or photographs.  *Id.* ¶ 9, Ex. A.

Plaintiffs provide the report of an expert who analyzed the SJPD's policies and training materials.  *See* Exp. Rpt.  He identifies "two major deficiencies" in the SJPD training materials. *Id.* ¶ 83.  First, he states that the training materials "are much more disorganized than what [he] typically encounter[s] when assessing police preparedness for handling crowd events."  *Id.*  He points to the lack of version control.  *Id.*  Second, he states that the training materials are "unbalanced and incomplete."  *Id.*  Specifically, they "focus almost exclusively on crowd control tactics, including the use of less-lethal weapons," while providing almost no information on

"crowd management strategies that are intended to *prevent* conflict and violence before it becomes necessary for police to resort to more aggressive crowd control tactics." *Id.*

The City's After Action Report also addresses training, noting that one of the themes from the after action review was a lack of training and experience. AAR at 4. It specifically states that "[c]rowd control training has been minimal and infrequent as mass training requires time away from already depleted patrol staffing." *Id.* It further explains that "[a]cademy training and the mandated annual training is insufficient for ensuring staff are the highly trained operators expected by the public." *Id.* at 25.

In looking at the evidence, the Court determines that there is no genuine dispute of material fact as to whether SJPD's training showed a deliberate indifference by SJPD to the rights of the individuals with whom SJPD officers come into contact. SJPD has shown that officers were required to go through extensive training. Plaintiffs point to the cartoon on the PowerPoint showing a shot in the groin, and the language stating "Don't hesitate[.] Always win[.]" Opp. at 24. These slides were inappropriate, but they do not rise to the level of deliberate indifference. And neither does the lack of version control or the focus on crowd control, as opposed to crowd management, identified by Plaintiff's expert. It cannot be said that "the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need." *Canton*, 489 U.S. at 390. Nor can it be said that the City made "a 'deliberate' or 'conscious' choice" to inadequately train officers. *Id.* at 389. The Court reiterates that "[a] municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train." *Connick*, 563 U.S. at 61. And this is not one of the cases that meets that bar.

This *Monell* theory thus fails.

c. Ratification

"A municipality may be held liable for a constitutional violation if a final policymaker ratifies a subordinate's actions." *Lytle*, 382 F.3d at 987. "To show ratification, a plaintiff must show that the 'authorized policymakers approve a subordinate's decision and the basis for it.'" *Id.*

(quoting *Christie v. Iopa*, 176 F.3d 1231, 1239 (9th Cir. 1999)).  The policymaker must have knowledge of the constitutional violation and actually approve of it—a failure to overrule a subordinate's actions, without more, is insufficient to support a § 1983 claim.  *Id.*  In other words, ratification requires an authorized policymaker to make a "conscious, affirmative choice" to endorse subordinate's actions.  *Gillette v. Delmore*, 979 F.2d 1342, 1346-47 (9th Cir. 1992).  A policymaker's after-the-fact approval of a subordinate's conduct that caused the alleged constitutional violations may be used as evidence that a municipality had a pre-existing policy that caused the alleged constitutional violations.  *Silva v. San Pablo Police Dep't*, 805 F. App'x 482, 485 (9th Cir. 2020).  To show that ratification was a "moving force" behind the constitutional deprivation, a plaintiff must demonstrate both causation in fact and proximate causation.  *Arnold v. Int'l Bus. Machs. Corp.*, 637 F.2d 1350, 1355 (9th Cir. 1981); *Dougherty v. City of Covina*, 654 F.3d 892, 900-901 (9th Cir. 2011).

Plaintiffs' theory as to ratification is not entirely clear, and it is hard to separate their arguments as to ratification from those as to supervisory liability.  *See* Opp. at 17-24.  Plaintiffs do argue that Defendants Garcia and Dwyer "planned, authorized, ordered, permitted, and ratified the SJPD response to the entire demonstration."  *Id.* at 21.  But while the Court determined there is disputed evidence that Dwyer set in motion a series of events that led to Plaintiffs' alleged constitutional violations, the Court determines there is no evidence that either Garcia or Dwyer ratified any acts of subordinates after the fact.

The evidence as to Garcia indicates that he authorized the use of tear gas as necessary, and he was informed that officers would be calling the protest an unlawful assembly.  Garcia Dep. at 31-33.  The evidence as to Dwyer is that he was the incident commander on May 29, 2020, and he authorized the use of less-lethal weapons on that date.  Garcia Dep. at 33:7-9; Tassio Dep. 1 at 36-37.  There is also evidence that SJPD conducted an investigation into Panighetti's shooting of Derrick Sanderlin.  Huang Decl., Ex. 13 ("Garcia Dep. 2") at 83:1-14.  This evidence is not sufficient to show that Garcia or Dwyer ratified the actions of any of the subordinate officers that caused Plaintiffs' constitutional deprivations.

Plaintiffs claim that Garcia and Dwyer were responsible for the following: SJPD wrongly

declared the protest and unlawful assembly through a loudspeaker but it was inaudible and/or unclear; SJPD only had one Long Range Acoustic Device to make announcements; and the police officers formed a barricade behind demonstrators, which constituted a "skirmish line" to "move the crowd." Opp. at 21. Plaintiffs provide no evidence that either Garcia or Dwyer ratified these decisions, other than that Garcia was informed that an unlawful assembly would be announced. Nor do Plaintiffs connect any of these theories of liability to their alleged constitutional deprivations. These arguments do not support ratification.

This *Monell* theory thus fails.

\*       \*       \*

The City's motion to dismiss Plaintiffs' *Monell* claims (Claims 17–18) is GRANTED.

## IV.   ORDER

For the foregoing reasons, IT IS HEREBY ORDERED that Defendants' motion for summary judgment is GRANTED IN PART AND DENIED IN PART as follows:

1.       Per Plaintiffs' concession, Defendants' motion for summary judgment as to all claims for intentional infliction of emotional distress (Claims 28-33, 35) is GRANTED;

2.       Defendant Yuen's motion for summary judgment as to all claims against him (Claims 1, 9, 20, 28) is GRANTED;

3.       Defendant Garcia's motion for summary judgment as to Cayla Sanderlin, Breanna Contreras, Pietro di Donato, Adira Sharkey, and Joseph Stukes's Section 1983 claims for violation of their Fourth Amendment rights (Claims 10-14) is GRANTED;

4.       Defendant Dwyer's motion for summary judgment as to Cayla Sanderlin's Section 1983 claim for violation of her Fourth Amendment rights (Claim 10) is GRANTED;

5.       Defendant Dwyer's motion for summary judgment as to Breanna Contreras, Pietro di Donato, and Adira Sharkey's Section 1983 claims for violation of their Fourth Amendment rights (Claims 11-13) is DENIED;

6.       Defendants Avila, Marshall, and Tassio's motion for summary judgment as to Vera Clanton's Section 1983 claim for violation of her Fourth Amendment rights (Claim 16) is DENIED;

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

7.      Defendants Panighetti and Dwyer's motion for summary judgment as to Derrick Sanderlin's Section 1983 claim for violation of his Fourth Amendment rights (Claim 9) is DENIED;

8.      Defendant Garcia's motion for summary judgment as to Derrick Sanderlin's Section 1983 claim for violation of his Fourth Amendment rights (Claim 9) is GRANTED;

9.      Defendant Garcia's motion for summary judgment as to Cayla Sanderlin, Breanna Contreras, Pietro di Donato, Adira Sharkey, and Joseph Stukes's Section 1983 claims for violation of their First Amendment rights (Claims 2-6) is GRANTED;

10.      Defendant Dwyer's motion for summary judgment as to Cayla Sanderlin, Breanna Contreras, Pietro di Donato, and Adira Sharkey's Section 1983 claims for violation of their First Amendment rights (Claims 2-5) is DENIED;

11.      Defendant Garcia's motion for summary judgment as to Vera Clanton's Section 1983 claim for violation of her First Amendment rights (Claim 8) is GRANTED;

12.      Defendants Panighetti and Dwyer's motion for summary judgment as to Derrick Sanderlin's Section 1983 claim for violation of his First Amendment rights (Claim 1) is DENIED;

13.      Defendant Garcia's motion for summary judgment as to Derrick Sanderlin's Section 1983 claim for violation of his First Amendment rights (Claim 1) is GRANTED;

14.      Defendants City and Panighetti's motion for summary judgment as to Cayla Sanderlin's loss of consortium claim (Claim 36) is DENIED;

15.      Defendant City's motion for summary judgment as to Cayla Sanderlin, Breanna Contreras, Pietro di Donato, Adira Sharkey, and Joseph Stukes's Bane Act claims (Claims 21-25) is GRANTED;

16.      Defendants City, Tassio, Avila, and Marshall's motion for summary judgment as to Vera Clanton's Bane Act claim (Claim 27) is GRANTED;

17.      Defendants City and Panighetti's motion for summary judgment as to Derrick Sanderlin's Bane Act claim (Claim 20) is GRANTED;

18.      Defendant City's motion for summary judgment as to Clanton's *Monell* claim (Claim 19) is GRANTED; and

19.     Defendant City's motion for summary judgment as to all Plaintiffs' *Monell* claims (Claims 17-18) is GRANTED.

Dated:  March 16, 2023

_____
BETH LABSON FREEMAN
United States District Judge